Patrick D. Robbins (CSBN 152288)
Jason Allen (CSBN 251759)
SHEARMAN & STERLING LLP
Four Embarcadero Center, Suite 3800
San Francisco, CA 94111-5994
Telephone:   (415) 616-1100
Facsimile:    (415) 616-1199
Email:        probbins@shearman.com
              jallen@shearman.com

Attorneys for Defendant
ROY LIN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR-12-0217 WHA |
| Plaintiff, | **DEFENDANT ROY LIN'S SENTENCING MEMORANDUM** |
| v. | |
| ROY LIN and JOHN LIN, | Date:         May 1, 2013 |
| Defendants. | Time:         11:00 a.m. |
| | Courtroom:  No. 8, 19th Floor |
| | Judge:        Hon. William H. Alsup |

**REDACTED PUBLIC VERSION**

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | MR. LIN'S PERSONAL HISTORY | | 4 |
| | A. | FAMILY | 4 |
| | | 1. Originally from Taiwan, Mr. Lin immigrated to the United States three decades ago after fleeing the guardianship of an abusive uncle in Brazil. | 4 |
| | | 2. Mr. Lin's immigrant, homemaker wife and three young children rely on him for financial and emotional support. | 7 |
| | B. | ██████████████████████ | 8 |
| | C. | PROFESSIONAL LIFE | 9 |
| | D. | COMMUNITY SERVICE | 10 |
| III. | LEGAL STANDARD | | 10 |
| IV. | MULTIPLE GROUNDS SUPPORT THE REQUESTED SENTENCING VARIANCE UNDER THE 18 U.S.C. § 3553(A) FACTORS | | 11 |
| | A. | MR. LIN'S PERSONAL HISTORY AND CHARACTERISTICS FAVOR LENIENCY. | 12 |
| | | 1. Mr. Lin's abusive childhood and his early separation from his parents warrant leniency. | 12 |
| | | 2. Collateral immigration consequences – deportation, harsher conditions of confinement, and potential additional detention – support leniency. | 13 |
| | | 3. Mr. Lin's extraordinary family circumstances as the irreplaceable source of financial and emotional support for his homemaker wife, three young children, and elderly father justify leniency. | 15 |
| | B. | ██████████████████████ | 17 |
| | C. | THE PURPOSES OF SENTENCING ARE SATISFIED BY A SIX-MONTH SENTENCE. | 19 |
| | D. | A HIGHER SENTENCE WOULD BE DISPROPORTIONATE TO THE OFFENSE AND CONTRARY TO THE SENTENCING COMMISSION'S POLICY STATEMENTS. | 21 |
| V. | CONCLUSION | | 23 |

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*FTC v. Inc21.com Corp.*, No. 10-cv-00022-WHA (N.D. Cal.)....................................................3, 22

4

*Gall v. United States*, 552 U.S. 38 (2007)............................................................................11, 12

5

*Jordan v. De George*, 341 U.S. 223 (1951) ...................................................................................14

6

*Kimbrough v. United States*, 552 U.S. 85 (2007)...........................................................................21

7

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)..................................................20

8

*United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) ..............................................................17

9

*United States v. Approximately $2,822,224.75 in Funds Seized from Eight Bank Accounts*,
      No. 09-cv-03119-WHA (N.D. Cal.)......................................................................................3

10

11

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ....................................................................12

12

*United States v. Coughlin*, No. 06-20005, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008)..............19

13

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ............................................................18

14

*United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) ......................................................................19

15

*United States v. Landa*, 281 F. Supp. 2d 1139 (N.D. Cal. 2003) ..................................................17

16

*United States v. Lanrose, No.* CR 07-37-M-DWM, 2008 WL 237655 (D. Mont. Jan. 25,
      2008).....................................................................................................................................19

17

18

*United States v. Leon*, 341 F.3d 928 (9th Cir. 2008).....................................................................16

19

*United States v. Maltese*, No. 90 CR 87-19, 191993 WL 222350 (N.D. Ill. June 22, 1993)........18

20

*United States v. Martin*, 363 F.3d 25 (1st Cir. 2004)....................................................................19

21

*United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) .............................................................19

22

*United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) .................................................................16

23

*United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wisc. 2003) ..........................................20

24

*United States v. Sandoval*, No. 94 CR 714-5, 1998 WL 325186 (N.D. Ill. June 8, 1998)............18

25

*United States v. Seiber*, No. 4:04-CR-28, 2005 WL 1801614 (E.D. Tenn. July 29, 2005) ..........19

26

*United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) ...................................................................14

27

*United States v. Thurston*, 456 F.3d 211 (1st Cir. 2006)...............................................................20

28

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) .................................................................... 21

*United States v. Vaughan*, No. 92 CR. 575-04 (RWS), 1993 WL 119704 (S.D.N.Y. Apr. 15, 1993) ........................................................................................................................................ 18

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) ..................................................... 12, 17

**STATUTES**

8 U.S.C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii) ........................................................................ 13

8 U.S.C. § 1101(f)(8) ..................................................................................................................... 13

8 U.S.C. § 1182(h) ......................................................................................................................... 13

8 U.S.C. § 1226(c)(1)(B) ............................................................................................................... 15

8 U.S.C. § 1227(a)(1)-(6) .............................................................................................................. 13

8 U.S.C. § 1229b(a) ....................................................................................................................... 13

8 U.S.C. § 1252 .............................................................................................................................. 15

77 Fed. Reg. 101 ............................................................................................................................ 22

18 U.S.C. § 1341 .............................................................................................................................. 1

18 U.S.C. § 1957 .............................................................................................................................. 1

18 U.S.C. § 3553(a) .............................................................................................................. 1, 2, 11, 12

18 U.S.C. § 3553(a)(2)(d) .............................................................................................................. 17

18 U.S.C. § 3624(c) ....................................................................................................................... 14

18 U.S.C. § 3624(c)(1) ................................................................................................................... 14

28 U.S.C. § 994(j) .......................................................................................................................... 23

8 U.S.C. §§ 1101-1537 .................................................................................................................. 13

**OTHER AUTHORITIES**

Bureau of Prisons, Health Services, 2012 National Formulary (Part 2) ....................................... 17

Ellis et al., At a "Loss" for Justice - Federal Sentencing for Economic Offenses, American Bar Ass'n, Criminal Justice, V. 25, No. 4 (Winter 2011) .................................................. 22

Prison Types & General Information, U.S. Dept. of Justice, Fed. Bureau of Prisons ................. 14

Recidivism of Offenders on Federal Community Supervision (Jan. 2013) .................................. 21

Transcript of Public Hearing, U.S. Sentencing Comm'n (Jan. 20, 2010) .................................... 15

U.S. Dept. of Justice, FY2013 Congressional Budget for BOP – Salaries and Expenses ............ 18

U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. 5100.07, Security Designation and Custody Classification Manual ............................................................. 14

U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. 5880.28, Change Notice Sentence Computation Manual 1-15A (1997) ...................................................... 15

U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. P5100.08, Inmate Security Designation and Custody Classification ........................................................... 14

"Why Crammers Win and Consumers Lose," Congressional Hearing (July 13, 2011) .............. 20

## I.    INTRODUCTION

This sentencing hearing presents a fundamental question under 18 U.S.C. § 3553(a), one that the Sentencing Guidelines do not effectively answer:  how much punishment for a particular defendant is enough?  Leaving aside any prison sentence, this defendant, Roy Lin, has been and will continue to be harshly punished in ways no typical offender ever experiences, and he has a personal history and circumstances like no typical offender.  He fully recognizes that his own conduct has virtually destroyed his life and family, his business and his financial net worth; ███ ████████████████████████████████ and it has forever ruined his ability to live in the United States, where his small children are citizens.  But at the same time, Mr. Lin wants the Court to recognize that despite a childhood of abuse and an utter lack of parental guidance, he had built an admirable life over thirty years in this country, earned an MBA and a green card, worked his way up the ladder in sales, established businesses of his own, started a family, and helped others around him achieve a better life as well.

He will now be forced to return penniless, sick and alone to Taiwan, where he has not lived since he was a child, and spend all of his time trying to earn enough money to keep his family off of public assistance here in California.  In terms of deterrence and humiliation, no amount of prison time can match the loss by Mr. Lin of decades of hard work, his long fall from social and economic success in the United States, and the dismal reality that he will face in Taiwan for what remains of his life.  With this as a background, it is simply not rational to impose a substantial sentence of incarceration on such a person, ████████████████████████████ ████████████████████████████████████ and when he will be forever removed to Taiwan after his sentence is complete.  Simply put, a substantial prison term will serve no sentencing purpose here.  It will not do anything but impose an inordinate and unnecessary cost on the taxpayer, who will foot the bill for housing and treating a ruined man who will be deported to another country.

Mr. Lin pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341, and one count of money laundering in violation of 18 U.S.C. § 1957.  The Presentence Report (PSR) calculates an offense level of 29 under the advisory Sentencing Guidelines and recommends a

sentence of 24 months imprisonment. For all the reasons stated here, Mr. Lin implores the Court to impose a sentence of six months imprisonment. This downward variance under 18 U.S.C. § 3553(a), which the Plea Agreement expressly permits, results in a sentence that is "sufficient, but not greater than necessary." This is so in light of the following facts of this particular case, and Mr. Lin's unique personal circumstances:

- 

- <u>Mr. Lin Was Literally Abandoned and Beaten As a Child</u>. As the PSR correctly notes, Mr. Lin's early separation from his parents and subsequent physical abuse as a child at the hands of a relative are a significant mitigating factor. PSR ¶ 101. Mr. Lin's parents sent him away from Taiwan three decades ago, at age twelve. His uncle in Brazil beat him and his brother with broomsticks, slapped them, screamed at them, and made them hold heavy objects above their heads for hours at a time as punishment. After two years, his parents sent them to another relative in the United States. With English as his third language, Mr. Lin worked hard to finish high school in America, at times while living alone with and caring for his younger brother. He became his high school student body president, worked at a dry cleaning business, and even obtained his MBA degree. Mr. Lin worked for years in the communications field, at Qwest Communications and other companies, and eventually started his own business, Inc21, a company that employed as many as twenty-five people.

- <u>Mr. Lin's Financial and Family Life Is in Ruins</u>. Now represented by court-appointed counsel, Mr. Lin has a net worth of just $68,000 and an annual salary of about $24,000, with which he supports his family of five, including his homemaker wife who speaks little English and their three young children. One of his children requires specialized medical care for a cleft palate. Only last month, Mr. Lin's new landlord instituted proceedings to raise his rent to five times the previous rate, ensuring his family's eviction. Mr. Lin's responsibilities extend to his elderly father, a Taiwanese immigrant who also lives in the Bay Area and is recovering from an aneurysm. The well-being and survival of Mr. Lin's family depends on his irreplaceable financial and emotional support.

- <u>Mr. Lin Will Be Deported to Taiwan, Where He Hasn't Lived Since Age 12</u>. Mr. Lin's decision to plead guilty to two aggravated felonies virtually ensures that, as a lawful permanent resident convicted of a felony, he will be deported from the country he has called home for the past three decades. He will be placed into removal proceedings to Taiwan, in custody, the moment his sentence is complete.

1   • The Government Has Recovered the Amount of the Loss Alleged. In the related
    FTC action,[1] this Court imposed a multi-million dollar restitution judgment arising
2   from the same conduct at Inc21 to which Mr. Lin and his brother have pled guilty.
    The government already has recovered from Mr. Lin, or is in a position to recover,
3   virtually the entire $5.3 million loss it calculates in this criminal case.[2]

4

5   • Mr. Lin Promptly Accepted Responsibility███████████████████████████████████.
    Mr. Lin fully accepts responsibility for his wrongdoing. He quickly and fully
6   acknowledged in this criminal case that he signed his name to inaccurate
    documents that permitted his company to place third-party charges for its products
7   on customer telephone bills via a process known as "LEC billing."

8

9   ████████████████████████████████████████████████████████████████████████ As

    he wrote to the Probation Office, in his own words:
10

11          I am really sorry for all the pain and trouble which I have caused to my
            customers and family members. I made some really silly mistakes, which I
12          have paid the price dearly, will be feeling regret for the rest of my life and
            will never do them again. I am willing to take the full responsibility and
13          blame no one but myself.

14  PSR ¶ 34.

15  • Mr. Lin's Extraordinarily Good Character Is Established by Dozens of Letters from
    Supporters. Mr. Lin's actions that led to the guilty plea are not representative of his
16  character, as evidenced by the outpouring of support in over thirty letters from
    friends, colleagues, and family.[3] Mr. Lin is a hardworking immigrant, a devoted
17  husband and father, regularly attends church, and is a valuable contributor to his
    community. The letters demonstrate that Mr. Lin's criminal conduct is an anomaly
18  in a life of humility and generosity to his family and others. He has no prior record
    and has also led a law-abiding life for four years since the offense conduct
19  concluded.

20  Mr. Lin hopes that the Court sees how he recognizes the seriousness of his offense, its

21  scale and harm.████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████He also hopes that the

23

24  [1] See FTC v. Inc21.com Corp., No. 10-cv-00022-WHA (N.D. Cal.). Further, the companion
    forfeiture action resulted in an order seizing over $2.5 million in funds as well as six properties
25  and two cars. United States v. Approximately $2,822,224.75 in Funds Seized from Eight Bank
    Accounts, No. 09-cv-03119-WHA (N.D. Cal.).
26
    [2] As of October 2010, the government estimated that it already had seized approximately $5.2
27  million in assets and funds. See FTC v. Inc21.com Corp., No. 10-cv-00022-WHA (N.D. Cal.)
    (Dkt. No. 172 at p. 18); Sentencing Recommendation, p. 2.

28  [3] The character letters in support of Mr. Lin are attached as exhibits to this Sentencing
    Memorandum.

DEF. ROY LIN'S                           3                CASE NO. CR-12-0217 WHA
SENTENCING MEMORANDUM                                     SFDOCS01/305934.10 09951/00007

Court sees how he has been thoroughly and harshly punished already.  He respectfully asks the Court to apply the sentencing factors found in Section 3553(a) and impose a sentence of six months imprisonment.  Under BOP regulations, because Mr. Lin is a foreign national, he will not spend any of that sentence designated to a half-way house or minimum security/camp facility.  He will spend it at best in a low security facility, which is yet another basis to consider a lower overall term.  This case is truly unique.  Mr. Lin's situation is genuinely harsh and unusual.  The Court does not need to do more to achieve punishment and deterrence here.

## II.   MR. LIN'S PERSONAL HISTORY[4]

A.   Family

1.   **Originally from Taiwan, Mr. Lin immigrated to the United States three decades ago after fleeing the guardianship of an abusive uncle in Brazil.**

Roy Lin, age 44, was born in Taichung, Taiwan, to parents who imbued him with an entrepreneurial spirit and a devotion to family.  Together, his parents owned and operated a lighting and fixture factory in Taiwan.  PSR ¶ 55.  Mr. Lin spent the first twelve years of his life living with his parents and younger brother, John, in Taiwan.  PSR ¶ 56.  They provided a stable, caring, and happy home for Mr. Lin.  With the public perception that China intended to invade Taiwan, however, Mr. Lin's parents feared that he and his brother would be forced to serve in the Taiwanese army if they remained in Taiwan.  PSR ¶ 56.

Consequently, in light of the withdrawal of Taiwan from the United Nations and the goal of providing their sons better educational opportunities, Mr. Lin's parents sent the Lin boys to live with an uncle in Brazil in 1981.  PSR ¶ 56; Letter from Sheng Jui Lin.  Sent half-way around the world as a twelve-year-old child, Mr. Lin did not know when he would see his parents again.  Mr. Lin could not have imagined the physical and mental abuse that awaited him over the next two years in Brazil.  Under the guardianship of his uncle, Mr. Lin worked seven days a week at the uncle's restaurant, often tackling eleven-hour shifts that involved helping the chefs in the kitchen and washing dishes.  PSR ¶ 57.  The Presentence Report describes this experience:

When he was unsatisfied with their work, the uncle would beat the defendant with

---

[4] The facts provided in this section are drawn from the PSR, the letters submitted on behalf of Mr. Lin, and records and papers on file in this action.

broomsticks, slap him across the face with his hands, and yell profanities in a demeaning fashion.  There were other times when the defendant was punished by holding a case of empty glass soda bottles above his head while maintaining a squatting position for two to three hours.  The defendant stated he was only allowed to leave the building for school and had to return home immediately after class.  His brother corroborated that they received this type of treatment, but considering their uncle owned the restaurant, they always had ample food and were never left hungry.  At times they were forced to eat until they vomited.  Through all the abusive treatment, the defendant did not inform his parents since all telephone calls were monitored by his uncle.

PSR ¶ 57.  Whenever the Lin brothers made mistakes, the uncle would curse and tell them they were worthless and would not amount to anything.

Only when Mr. Lin's parents visited Brazil did they learn of the two years of child labor suffered by their sons.  Today, Mr. Lin's father still regrets the decision to send the boys abroad.  Letter from Sheng Jui Lin.  As Mr. Lin's wife writes:

Each time my mother-in-law spoke of the past, she would always feel sad and was filled with remorse for having Roy experience such sufferings when he was a child, but Roy always consoled her that it was those sufferings that made him able to bear more hardships than others and better understand that he should work very hard.

Letter from Mei-Ying Wu.  Following the exposure of these living conditions to his parents, Mr. Lin and his brother were sent in 1983 to live with his father's cousin in San Francisco, California.  PSR ¶¶ 57-58.  Unfortunately, Mr. Lin's immigration to the United States, however, brought more of the same:  a controlling relative who prevented Mr. Lin from making friends and even refused to feed him the same quality food as his own family.  PSR ¶ 58.  Nevertheless, only a year after arriving in America, Mr. Lin became student body president at Newcomer High School, a school for immigrants in San Francisco.  PSR ¶ 60.  He took English as a second language ("ESL") classes in high school – even though English was his *third* language after Mandarin Chinese (Taiwan) and Portuguese (Brazil) – but he always felt educationally behind because he moved twice to different countries.  See PSR ¶ 71.

Ultimately, Mr. Lin and his brother learned how to support and care for themselves on their own at a very young age, relying on money from their parents in Taiwan to get by.  Even after moving out from the cousin's house to live alone with his brother, and lacking an encouraging adult figure in his life, Mr. Lin went on to finish high school and then college in San

Francisco.  PSR ¶¶ 58, 70.  While putting himself through school, Mr. Lin had a newspaper route and worked at a San Francisco dry cleaning business purchased by his mother as an investment while she remained in Taiwan.  PSR ¶¶ 59, 78.  Mr. Lin pursued a graduate-level degree in business and earned his MBA in 1995.  PSR ¶ 70.

That year, Mr. Lin's parents moved from Taiwan to San Francisco.  PSR ¶ 59.  Mr. Lin's father recalls that he and his wife relied heavily on Mr. Lin during that time:

> [W]e even needed his care and became his burden for that we did not know English, but he had never complained and on the contrary, he tried his best to help us adapt to the life in the United States.  He was such a cheerful child that he had always been our good laugh and tried to cheer us up when we were upset.

Letter from Sheng Jui Lin.  Mr. Lin's mother owned a deli and then a Japanese restaurant after arriving in the States.  PSR ¶¶ 55, 59.  Working hard to ease his parents' transition to the United States and give them an early retirement, Mr. Lin embodied the cultural and Confucian custom of filial piety, respect for one's parents and ancestors.  Letters from Sheng Jui Lin; Mei-Ying Wu; Ying-Yen & Zuei-Fuei Hsu; and Stephen Cheng.

The time Mr. Lin spent with his mother would be short-lived, however, as she passed away in December 2006 at age 60 as a result of skin cancer.  PSR ¶ 55.  Mr. Lin's father recalls that Mr. Lin provided necessary stability during this time:

> Our family was in deep sorrow and I could not help crying each time when I thought of my wife of many years.  During the complete first half year after my wife passed away, I was relying on Roy to distract me from my sadness by chatting with me or bringing me out for a walk almost every day.  I really did not know how to survive through those days without his accompanying.

Letter from Sheng Jui Lin.  Today, Mr. Lin's father is seventy-four years old and in frail condition, having suffered a brain aneurysm in 2002.  PSR ¶ 55.  Mr. Lin is very close with his father and concerned for his ongoing health, particularly as his father fainted twice and required emergency care within the past three months.  PSR ¶ 55.  As Mr. Lin's wife writes:

> Roy was really a filial son, and this could particularly be seen from his close companion with his mother when she was sick, during which period, he showed great concern for his mother and tried to relieve her physical pain by massaging. He also showed great respect to his father and often accompanied him to chat. After his mother passed away, he became his father's spiritual sustenance and center of life.  In addition to doubling listening to his father's pain, he also often

accompanied him on a walk to relieve his loneliness.

Letter from Mei-Ying Wu.  As Mr. Lin's friend Daniel Guillory observes, after Mr. Lin's mother passed away, he "immediately spent time and energy on creating a comfortable life for his father. So many of us as Americans try to outsource responsibility for our family to someone else, but Roy has always been very involved."  Letter from Daniel Guillory.  Mr. Lin wants to participate in the final years of his father's life with him and be available to provide for him.  PSR ¶ 64.

### 2.  Mr. Lin's immigrant, homemaker wife and three young children rely on him for financial and emotional support.

Mr. Lin married his wife nearly seven years ago, in July 2006.  PSR ¶ 61.  The couple now has three young children:  two daughters, age six and four; and a son, age one.  PSR ¶ 61.

Mr. Lin has made it a priority to spend as much time as possible with his family.  His wife writes:

> Roy is a man who loves his family and children, and he called me and our children every day when he was free, to see if everything is fine.  Every time he went back home, the first thing he often did is to hug the kids and play with them, and our kids love their father very much.  If Roy went back a bit late, they might keep on asking when their dad would be back, or just simply came to the window so that they could see their dad when he drove the car into the garage.  They all waited to give their dad a big hug.

Letter from Mei-Ying Wu.  Mr. Lin's love for his family is no secret to those who know him well. His friend Rob Wensing writes:

> I recall, on many occasions, Roy proudly showing me photos of his children, [one] born in 2007 and [another] born in 2009.  Throughout the years, I have found Roy to be a kind, sincere, well-intentioned person.  Above all, he values and is committed to family.  This case has been difficult on Roy, but I think he is mostly concerned about its impact on his family.

Letter from Rob Wensing; <u>see also</u> Letter from James Smith ("I know Roy is very committed to his family, especially his wife and his children – frankly his children are much of what he talks about when we see one another.").  Mr. Lin wants to see his children grow up and set a positive example for them.  He even is a member of a school parent-teacher association and one of his future goals is "spending as much time as possible with his children . . . ."  PSR ¶¶ 60, 64.

Mr. Lin's family depends on him not only for financial support – his wife speaks little English and is a full-time homemaker – but also for emotional support.  <u>See</u> PSR ¶ 61.  In

1   particular, his four-year-old daughter was born with a cleft palate and attends ongoing language

2   therapy at Kaiser Permanente Medical Center.  PSR ¶ 61.  Mr. Lin's one-year-old son experiences

3   respiratory problems.  PSR ¶ 61.

4       In the aftermath of Inc21's demise in 2010, Mr. Lin has worked hard to rebuild his

5   professional life and provide for his family.  He took a job at Originatelabs.com as a full-time

6   marketing manager but was laid off when the company eliminated his department.  PSR ¶ 75.  He

7   currently is employed as a sales manager for Outlook United in San Mateo, where he earns an

8   annual salary of just $24,000 plus commission to support his family of five.  PSR ¶ 73.  Most

9   recently, the home in which Mr. Lin's family lives has been sold, giving Mr. Lin a new landlord

10  who seeks to raise his rent over five times its previous amount from when his brother owned the

11  home – a financially impossible burden for the Lin family to meet.  See Letter from Mei-Ying Wu.

12  Mr. Lin's family is struggling to survive every day.

13      B.



C.     Professional Life

Until this proceeding, Mr. Lin had never been charged with or convicted of any crime.  Mr. Lin entered the telecommunications business after college with modest positions like selling prepaid phone cards, distributing mobile phones, and reselling long-distance services.  PSR ¶ 78.  During this period, Mr. Lin learned about local exchange carrier billing, also known as "LEC billing," which enables third-party vendors to charge customers for products and services by including charges on local phone bills.

Mr. Lin wanted to start his own company, however, and finally did so with the incorporation of Inc21.  See PSR ¶ 8.  Along with his brother, John, Mr. Lin operated Inc21 and its affiliated and subsidiary companies, including GlobalYP, NetOpus, JumPage Solutions, and GoFaxer.  PSR ¶ 8.  GlobalYP provided online directory-based information, NetOpus provided web hosting services, JumPage Solutions provided search engine optimization, and GoFaxer was an Internet faxing service.  PSR ¶ 8.  The Inc21 companies billed customers through LEC billing.  PSR ¶ 10.

Mr. Lin fully acknowledges his wrongful conduct:  misrepresenting facts on applications submitted to billing aggregators in order to obtain access to LEC billing.  The intent in Mr. Lin's heart, however, was not simply to profit through deception.  If it were, he would have stopped at completing the applications and waited for the money to come in.  He would not have worked hard every day to build his business like he did, at one point employing approximately twenty-five individuals at the company and securing at least some legitimate customers.  See Motion to Suppress (Dkt. No. 36).  Mr. Lin's former accountant at Inc21 writes of his belief that Mr. Lin "is a kind, ethical and sincere man" who is "committed to solid business and family values."  See

1    Letter from Reza Noorkayhani.

2         D.    Community Service

3         Beyond the care Mr. Lin provides to his own family, his life has been marked by a

4    willingness to help others in need. ████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████ This

6    included a donation of ten computers to the Senior Ministry at the church, allowing seniors to

7    learn how to use computers. <u>See</u> Letters from Jeffrey Sun and Chris Chiang. Similarly, Stephen

8    Cheng describes Mr. Lin's "generous donations to the local church" and, on a more personal level,

9    Mr. Lin's generosity and willingness to help when Mr. Cheng encountered a difficult financial

10   situation. Letter from Stephen Cheng; <u>see also</u> Letter from Chin Tsai Liang ("In 2008, . . . my

11   motel suddenly encountered serious financial crisis. Roy timely lent a hand to help me survive the

12   financial crisis; otherwise my motel would go bankrupt."); Letter from Michael Liu (following

13   Mr. Lin's "considerable financial assistance" to Mr. Liu's business that ultimately closed, "Roy

14   had never asked me to repay his investment, and on the contrary, he was concerned about what I

15   was going to do next and earnestly asked me if I needed his help").

16        Likewise, a former tenant who rented from Mr. Lin underscores his "deep compassion" for

17   his community and how, during the recent economic recession, "without [Mr. Lin's] help many

18   would have been in disastrous financial pain including myself." Letter from Rosa Ko. Mr. Lin's

19   pastor at his church in San Jose, Ralph Su, writes:

20        Roy has been actively engaging church ministries even though he and his family
         live in San Francisco. They constantly drive a long distant [sic] to join weekend
21       fellowship group meetings and Sunday worship services since they desire to be a
         part of this community of faith. They proactively reach out to their community
22       and provide their supports particularly to those who just newly arrived from
         aboard [sic].
23

24   Letter from Ralph Su. Although Mr. Lin strayed from his core values, he has returned to his

25   religious community to make things right. Mr. Lin's life is filled with examples of kindness while

26   never expecting anything in return.

27   **III.    LEGAL STANDARD**

28        By statute, the Court is required to "impose a sentence sufficient, but not greater than

---

DEF. ROY LIN'S
SENTENCING MEMORANDUM

10

CASE NO. CR-12-0217 WHA
SFDOCS01/305934.10 09951/00007

necessary" to comply with the purposes of sentencing, which are:  (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a). The statute also provides the Court with a list of seven factors it must consider when determining the appropriate sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to comply with the goals of sentencing;
>
> (3-4) the kinds of sentence and the sentencing Guidelines range;
>
> (5) any pertinent Sentencing Commission policy statement;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Id.  The starting point for making a sentencing calculation using the Section 3553(a) factors is the range set out under the now-advisory U.S. Sentencing Guidelines.  Gall v. United States, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  After giving both parties a chance to argue in favor of a sentence they each deem appropriate, the Court considers whether the Section 3553(a) factors support the sentence requested by either party.  Id. at 49-50.  The Court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented."  Id. at 50.  Extraordinary circumstances are not required to justify a sentence outside the Guidelines range.  Id. at 47.

IV.    **MULTIPLE GROUNDS SUPPORT THE REQUESTED SENTENCING VARIANCE UNDER THE 18 U.S.C. § 3553(A) FACTORS**

As correctly calculated by the U.S. Probation Office, Mr. Lin's offense level is 29 under the current Guidelines.  See U.S.S.G § 2B1.1.  The Guideline range for imprisonment is 87 to 108

months.  PSR ¶ 84.  "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence."  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc); see also Gall, 552 U.S. at 59 ("Guidelines are only one of the factors to consider when imposing sentence . . . .").  The Supreme Court's recent sentencing cases have "breathe[d] life into the authority of district court judges to engage in individualized sentencing," United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (quotation omitted), and confirmed the power of district courts to vary from the Guidelines in appropriate cases.  This is such a case.

In the plea agreement, the parties agreed that a sentence of imprisonment of no more than 41 months is appropriate.  PSR ¶ 3.  The agreement also, however, provided Mr. Lin with the opportunity to argue for a further sentencing variance under the Section 3553(a) factors.  Id.  For the reasons set forth below, the Section 3553(a) factors warrant leniency and support a sentence of six months.

A.     Mr. Lin's personal history and characteristics favor leniency.

Perhaps the most important factor in any sentencing is the personal history and characteristics of the defendant.  See 18 U.S.C. § 3553(a)(1).  In this case, a number of unique personal circumstances justify a significant sentencing variance.

1.     **Mr. Lin's abusive childhood and his early separation from his parents warrant leniency.**

As acknowledged by the Probation Office, the Court should consider Mr. Lin's early separation from his parents in Taiwan and the childhood abuse Mr. Lin suffered at the hands of a relative caring for him in Brazil as mitigating factors.  PSR ¶ 101 & Sentencing Recommendation, p. 2.  Mr. Lin was sent to a foreign country at age twelve with his ten-year-old brother to live with a relative he had never met in a country where people spoke a language he did not understand.  As correctly stated in the PSR, Mr. Lin's uncle in Brazil physically and emotionally abused him and his brother.  PSR ¶ 57.  The uncle hit them with broomsticks, slapped them in the face, and yelled profanities.  PSR ¶ 57.  As punishment, Mr. Lin had to hold a case of empty soda bottles on his head while maintaining a squatting position for two to three hours.  PSR ¶ 57.  As a young boy, Mr. Lin not only missed his parents but also could not tell them the truth because his calls home

were monitored by his uncle.  <u>See</u> PSR ¶ 57.  Mr. Lin felt abandoned and scared.

At age fourteen, Mr. Lin and his brother were sent to live with their father's cousin in San Francisco, California – yet another relative he had never met, another new country, and another new language he did not understand.  <u>See</u> PSR ¶ 58.  The boys lived briefly with the cousin until their parents purchased a house for them to live in, unsupervised, in San Francisco.  <u>See</u> PSR ¶ 58.  A guardian in the same neighborhood checked on them periodically.  In an unfamiliar country, the Lin brothers were on their own and learned how to support themselves at a very young age.  Mr. Lin overcame many obstacles – taking care of himself and his brother, learning English, often working two jobs – and succeeded in education, ultimately obtaining his MBA degree in 1995 at age twenty-six.  Mr. Lin's perseverance in the face of extreme childhood adversity should be considered during sentencing.

### 2. Collateral immigration consequences – deportation, harsher conditions of confinement, and potential additional detention – support leniency.

Mr. Lin is a lawful permanent resident of the United States.  PSR ¶ 62.  As a non-citizen, he faces several adverse effects of his conviction that would not be suffered by an otherwise equally-situated citizen who committed the identical offense.

Mr. Lin will be removed from the United States notwithstanding the nearly three decades that he lawfully resided in this country and the close family members who live here – his immigrant spouse, three children, and elderly Taiwanese father.  Mr. Lin pled guilty to two offenses constituting aggravated felonies, rendering him subject to deportation.[5]  PSR ¶ 62 & Sentencing Recommendation, p. 3.  Further, Mr. Lin's acceptance of the two aggravated felony convictions likely made him ineligible for relief from removal (8 U.S.C. § 1229b(a)), inadmissible (8 U.S.C. § 1182(h)), permanently ineligible for naturalization (8 U.S.C. § 1101(f)(8)), and subject to mandatory DHS custody without release on bond during any removal proceedings.  PSR ¶ 62.  Removal from this country is a painful and life-long adverse consequence of Mr. Lin's convictions that would not be suffered by an otherwise equally-situated citizen.  <u>See</u> <u>Jordan v. De George</u>, 341

---

[5] The Immigration and Nationality Act (8 U.S.C. §§ 1101-1537) sets forth six categories of deportable offenses (8 U.S.C. § 1227(a)(1)–(6)), including offenses coming within the definition of an "aggravated felony," which includes any fraud offense involving a loss exceeding $10,000.  <u>See</u> 8 U.S.C. §§ 1101(a)(43)(M)(i), 1227(a)(2)(A)(iii).

U.S. 223, 232, 243 (1951) (Jackson, J., dissenting) (describing deportation as "a life sentence of banishment in addition to the punishment which a citizen would suffer for the identical acts"; "Deportation proceedings . . . extend the criminal process of sentencing to include on the same convictions an additional punishment of deportation.").

Mr. Lin will also face harsher conditions of confinement than would a citizen who otherwise is identically situated because the BOP does not permit noncitizens to serve their terms in a minimum security facility, the lowest security designation for federal prisons.[6]  Rather, BOP policy mandates placement of noncitizens such as Mr. Lin in no less than low security facilities.[7] In addition, Congress has directed that the BOP "shall, to the extent practicable" generally place prisoners in a facility that enables community readjustment, such as a halfway house, for up to one year at the end of a term.  18 U.S.C. § 3624(c)(1).  Mr. Lin, however, is ineligible for such end-of-sentence confinement, and instead would remain at his original facility.  See id.; United States v. Smith, 27 F.3d 649, 650-51 (D.C. Cir. 1994) ("[The defendant's] status as a deportable alien renders him almost certainly ineligible for the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend part of the last 10% of their sentences (but no more than six months) under conditions—possibly including home confinement—that will 'afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community.'").[8]

---

[6] "Minimum security institutions, also known as Federal Prison Camps (FPCs), have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing . . . [and] are work- and program-oriented."  Prison Types & General Information, U.S. Dept. of Justice, Fed. Bureau of Prisons, available at http://www.bop.gov/locations/institutions/index.jsp (last visited April 23, 2013).  On the other hand, "[l]ow security Federal Correctional Institutions (FCIs) have double-fenced perimeters, mostly dormitory or cubicle housing, and strong work and program components.  The staff-to-inmate ratio in these institutions is higher than in minimum security facilities."  Id.

[7] U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. P5100.08, Inmate Security Designation and Custody Classification, Ch. 5, at 9, available at www.bop.gov/policy/progstat/5100_008.pdf (last visited April 23, 2013).

[8] Mr. Lin's status as a deportable alien is a "Public Safety Factor" unless he can show (1) verified strong family/community ties in the United States; (2) verified history of domicile (five years or more) in the United States; and (3) verified history of stable employment in the United States for at least three years prior to incarceration.  See U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. 5100.07, Security Designation and Custody Classification Manual, Ch. 7, at 3-4 (1999), available at http://www.bop.gov/policy/progstat/5100_007.pdf (last visited April 23, 2013).  This last factor likely prevents Mr. Lin from qualifying for an exception.

Finally, immigration authorities will take Mr. Lin into custody at the conclusion of his detention.[9]  At that point, he may be imprisoned for weeks or possibly even months after finishing the sentence imposed by the Court.[10]  This incarceration would be in addition to the sentence imposed by the Court because the BOP does not credit immigration detention towards the term imposed.[11]

3.  **Mr. Lin's extraordinary family circumstances as the irreplaceable source of financial and emotional support for his homemaker wife, three young children, and elderly father justify leniency.**

With his wife, herself an immigrant from Taiwan, Mr. Lin has three very young children. One was born with a cleft palate and attends ongoing language therapy, while another experiences respiratory problems.  Mr. Lin plays a pivotal role in caring for the children, as explained by his wife:

> Due to [daughter's] incorrect pronunciation, she often cannot be understood by others or was made fun of by others.  I am always worried that she may be pushed out by her classmates, but Roy often encouraged her to speak more and corrected her pronunciation, and consoled me that as long as she received correction training, maybe someday in the future, her pronunciation would be better than the ordinary people.  He always helped me to look at things in an optimistic way, and straightened me out while I am in bad mood, so I have always trusted and relied on him.

Letter from Mei-Ying Wu.  Every day is a struggle to make ends meet on Mr. Lin's small salary of only $24,000 a year plus commissions, which is not enough to cover the family's monthly expenses.  See Sentencing Recommendation, p. 3.  That limited sum will vanish while Mr. Lin is incarcerated, leaving his wife to fend for herself in raising three young children, with no local

---

[9] See 8 U.S.C. § 1226(c)(1)(B) ("The Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii) [aggravated felonies] . . . of this title . . . when the alien is released . . . .").

[10] See Transcript of Public Hearing at 33-34, U.S. Sentencing Comm'n (Jan. 20, 2010) (testimony of John T. Morton, Asst. Sec'y of Homeland Sec. for ICE) (a "large number" of deportable federal inmates are held in immigration custody, which can be from "40 days to months, in very rare instances, years"), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20100120-21/public_hearing_transcript.pdf (last visited April 23, 2013).

[11] U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. 5880.28, Change Notice Sentence Computation Manual 1-15A (1997) ("Official detention does not include time spent in the custody of the U.S. Immigration and Naturalization Service (INS) under the provisions of 8 U.S.C. § 1252 pending a final determination of deportability."), *available at* www.bop.gov/policy/progstat/5880_028.pdf (last visited April 23, 2013).

1  family available to provide care so that she could work to support them.  Mr. Lin's family is

2  unlikely to relocate to Taiwan even if Mr. Lin is deported.  The children will be unable to visit

3  their father in any case while he is incarcerated, and can only see him once he is released and/or

4  deported if they can afford to travel to Taiwan.  The thought of raising three children alone is

5  "daunting" to Mr. Lin's wife.  PSR ¶ 63.  Mr. Lin's greatest worry is ensuring the well-being of

6  his family.

7      Mr. Lin also needs to provide for his elderly father, who relies more and more on Mr. Lin

8  following an aneurysm and two fainting spells.  See Letter from Sheng Jui Lin.  In the meantime,

9  Mr. Lin's family is attempting to deal with a new landlord who has petitioned to raise Mr. Lin's

10  rent five-fold, all but ensuring an eviction under the current circumstances.  After a life filled with

11  good works and devotion to his church, Mr. Lin is not only emotionally broken but also

12  financially broke, with a family potentially about to be kicked out on the street.  He simply wants

13  to work, whether it is here or in Taiwan, to provide for his family.

14      Courts often consider such factors in their sentencing decisions, particularly where, as

15  here, the defendant is an irreplaceable caretaker of children, elderly, and/or seriously ill family

16  members, and sentencing leniency will protect those family members from the impacts of the

17  defendant's prolonged incarceration.  For example, the First Circuit recently affirmed a substantial

18  downward variance – to 6 months home monitoring, 3 years probation, and 1000 hours

19  community service – for defendants convicted of mail fraud and other counts who originally

20  faced, just like Mr. Lin, an advisory Guideline range of 87 to 108 months incarceration.  See, e.g.,

21  United States v. Prosperi, 686 F.3d 32, 34 (1st Cir. 2012).  Justifying leniency, the court observed

22  the "atypical and powerful" family circumstances of one defendant who served as his wife's

23  caretaker during her battle with terminal cancer and recognized that the other defendant cared for

24  his disabled daughter and elderly parents.  Id. at 48-49.

25      Likewise, Mr. Lin is the irreplaceable cornerstone of his family.  He respectfully urges the

26  Court to consider his extraordinary family circumstances as a basis for the Court's discretionary

27  exercise of leniency in sentencing.  See United States v. Leon, 341 F.3d 928, 932-33 (9th Cir.

28  2008) (affirming departure to sentence of 8 months imprisonment and 8 months home detention,

though Guidelines advised sentence within range of 27 to 33 months imprisonment, where defendant was only person available to care for dependent and ailing wife); see also United States v. Aguirre, 214 F.3d 1122, 1127 (9th Cir. 2000) (affirming departure because death of defendant's husband left their eight-year-old son without a custodial parent); United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (imposing no jail time and instead providing for 1000 hours of community service and five years of supervised release, though Guidelines advised range of 41 to 51 months imprisonment, where eight-year-old daughter depended on defendant, who had devoted himself to his business and building an honorable life following conviction); United States v. Landa, 281 F. Supp. 2d 1139, 1146 (N.D. Cal. 2003) (sentencing departure for defendant with injuries from car accident resulting in "ongoing and serious need for specialized medical attention," as well as need to care for teenage son and elderly parents).

B. ███████████████████████████████

Under Section 3553, the Court should consider "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

1
2
3
4
5
6
7
8
9
10



11    The government may point out that the BOP is able to provide Mr. Lin with medical care,

12  but courts have rejected that argument as controlling when medical treatment during incarceration

13  is costly and inefficient.[12] See United States v. Edwards, 595 F.3d 1004, 1011 (9th Cir. 2010)

14  (affirming downward variance in bankruptcy fraud/false statement case where "imprisoning

15  [defendant with diabetes and related complications] would simply pass the cost of medical care on

16  to taxpayers" and a "sentence of probation would satisfy the requirement of providing needed care

17  in the most effective manner" even though BOP "was capable of providing for [his] medical

18  care"); United States v. Maltese, No. 90 CR 87-19, 191993 WL 222350, at *9-10 (N.D. Ill. June

19  22, 1993) (granting departure for defendant suffering from liver cancer who required

20  chemotherapy and other expensive medical treatment, determining alternative to incarceration

21  would be equally efficient and less costly, and rejecting government argument that BOP was

22  equipped to undertake care and treatment of virtually any medical problem an inmate may have

23  during course of incarceration, including care and treatment for cancer); see also United States v.

24  ────────────────

25  12 ████████████████████████████████████ See United States v. Vaughan, No.

26  92 Cr. 575–04 (RWS), 1993 WL 119704, *1 (S.D.N.Y. Apr. 15, 1993) (imposing departure of one
    year imprisonment, one year of home detention, and three years of supervised release, though
    Guidelines advised 87 to 108 months imprisonment, where defendant suffered from fatal form of

27  cancer and, although defendant seemed to respond well to chemotherapy, doctor's prognosis that
    defendant could live for eight more years with proper treatment was "by no means certain");

28  United States v. Sandoval, No. 94 CR 714–5, 1998 WL 325186, at *5-6 (N.D. Ill. June 8, 1998)
    (defendant's advanced prostate cancer, requiring constant medical care, justified departure).

| DEF. ROY LIN'S | 18 | CASE NO. CR-12-0217 WHA |
| SENTENCING MEMORANDUM | | SFDOCS01/305934.10 09951/00007 |

1  Martin, 363 F.3d 25, 50 (1st Cir. 2004) ("Something more than mere boilerplate language is

2  necessary to assure the court that the BOP can adequately care for [defendant] given his

3  substantial history of medical difficulty."); United States v. Gee, 226 F.3d 885, 902 (7th Cir. 2000)

4  (refusing to rely on letter describing "BOP's ability to handle medical conditions of all kinds").

5       The risk of lengthy incarceration to Mr. Lin's health and the high cost to the American

6  taxpayer can be avoided through a more lenient sentence.  See e.g., United States v. McFarlin, 535

7  F.3d 808, 810-12 (8th Cir. 2008) (recognizing propriety of "variances on the basis of poor health"

8  and affirming sentence of 3 years probation to be served under home detention, despite Guideline

9  range of 78 to 97 months); United States v. Coughlin, No. 06-20005, 2008 WL 313099, at *1, 3, 6

10  (W.D. Ark. Feb. 1, 2008) (finding variance of 5 years probation and two years home detention

11  appropriate, despite Guideline range of 27 to 33 months, where defendant suffered from severe

12  medical problems and would "be able to receive any medical treatment available without the

13  parameter of the Bureau of Prisons' limited resources"); United States v. Lanrose, No. CR 07-37-

14  M-DWM, 2008 WL 237655, at *1, 5, 7 (D. Mont. Jan. 25, 2008) (imposing variance of 3 years of

15  probation with 6 months of house arrest, despite Guidelines range of 18 to 24 months, for

16  defendant suffering from spinal and other damage, and significant psychological problems);

17  United States v. Seiber, No. 4:04-CR-28, 2005 WL 1801614, at *1, 4 (E.D. Tenn. July 29, 2005)

18  (imposing variance of 5 years of probation, despite Guideline range of 97 to 121 months, where

19  defendant suffered from severe medical problems).

20

21

22

23

24       C.    The purposes of sentencing are satisfied by a six-month sentence.

25       Section 3553(a)(2)(A) directs a court to consider whether a sentence will sufficiently serve

26  the purposes of sentencing:  punishment, deterrence, incapacitation, and rehabilitation.

27       A lengthy prison sentence is not necessary to serve these purposes, particularly in light of

28  the financially devastating FTC civil litigation against Mr. Lin, which – with its restitution

1  judgment and numerous collateral personal consequences – already served part of the purposes of

2  sentencing.  See United States v. Redemann, 295 F. Supp. 2d 887, 896-97 (E.D. Wisc. 2003)

3  (observing "three of the primary purposes of sentencing were partially achieved before this

4  [criminal] case was filed" as a result of prior civil litigation resulting in substantial monetary

5  penalty and restitution order, significant adverse publicity following FBI investigation, soured

6  personal relationships, emotional harm to children, injury to business, and health problems leading

7  to wife's death).  Here, as noted, Mr. Lin has been harshly and publicly punished in every possible

8  sense – financially, emotionally, physically, personally, and professionally.  See Sentencing

9  Recommendation, p. 2 ("In the scope of the overall loss and the fact that $37.9 million has been

10  ordered in the related civil judgment, a lengthy sentence of imprisonment would be unduly harsh.

11  To no fault other than his own, the defendant has lost the reputation of his company, has

12  surrendered most of his assets, and will lose the ability to provide for his family.").

13      The consequences Mr. Lin already faces will adequately deter him – and others – from

14  future misconduct, which mitigates the need to protect the public from further crimes.  This is

15  bolstered by the fact that Mr. Lin had no criminal record prior to this case, not to mention that

16  "someone else in defendant's position tempted to also become involved in such a scheme need

17  only consider what happened to defendant in order to reconsider; thus, general deterrence was

18  served as well."  Redemann, 295 F. Supp. 2d at 897.  General deterrence also is less necessary in

19  this case as the LEC billing industry already has been under high governmental scrutiny in recent

20  years.  See "Unauthorized Charges on Telephone Bills:  Why Crammers Win and Consumers

21  Lose," Congressional Hearing (July 13, 2011), available at http://www.gpo.gov/fdsys/pkg/CHRG-

22  112shrg71640/pdf/CHRG-112shrg71640.pdf (last visited April 23, 2013).

23      "[E]ven relatively short sentences can have a strong deterrent effect on prospective 'white

24  collar' offenders."  United States v. Adelson, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (imposing

25  sentence of 42 months imprisonment and $50 million restitution, though Guideline range was life

26  imprisonment capped only by an 85-year maximum sentence, for CEO convicted of conspiracy,

27  securities fraud, and filing false reports with SEC); see United States v. Thurston, 456 F.3d 211,

28  215 (1st Cir. 2006) (quoting district court's reasoning that "'the most significant decision in

sending a message to potential white collar criminals is the decision to send the defendant to prison.  It's not so much the amount of time, it's whether you go away.'") (variance aff'd, <u>United States v. Thurston</u>, 544 F.3d 22, 25-26 (1st Cir. 2008)).  In short, it is one thing to conclude that white collar offenders should do prison time for their offense.  It is another to assume that long and not necessarily rationally imposed prison terms serve as an effective deterrent.  The data suggests that in some cases, they do not, and the interests of society and the federal government can be served just as effectively by a lower prison sentence under appropriate circumstances.

Finally, Mr. Lin's risk of recidivism is extremely low given his lack of a criminal history, drug abuse or mental health problems, or unemployment, and the many tools used by the Probation Office to monitor compliance.  <u>See, e.g.</u>, Rhodes et al., <u>Recidivism of Offenders on Federal Community Supervision</u> (Jan. 2013), *available at* https://www.ncjrs.gov/pdffiles1/bjs/grants/241018.pdf, at 12-13 (last visited April 23, 2013) (study funded by U.S. Department of Justice identifying risk factors for recidivism including criminal history, gender, race, drug abuse problems, mental health issues, unemployment and the need for financial help, housing, and transportation).

Given Mr. Lin's contributions to family, colleagues, and charity, his presence in society is a boon, not a risk.  A substantially below-Guidelines sentence is more than sufficient to afford just punishment for Mr. Lin's crime.

        D.     <u>A higher sentence would be disproportionate to the offense and contrary to the Sentencing Commission's policy statements.</u>

Section 3553(a) contains an overarching provision instructing district courts to "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing . . . ." <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).  Here, Mr. Lin's Guideline range is drastically increased by the government's loss estimate:  $5,323,538.27, representing the monetary sum derived from access to LEC billing through the billing aggregators ILD Telecommunications and PaymentOne.  PSR ¶ 27.  The civil judgment in the amount of $38 million and the loss calculation in this criminal action of $5.3 million, however, do not reflect Roy Lin's gain.  Several points regarding this loss calculation bear emphasizing.

The government has recovered, or is in a position to recover, assets exceeding the $5.3

1   million loss it calculates in this criminal case.  Indeed, the U.S. Attorney's Office acknowledged in

2   October 2010, more than two years ago, that it already had seized approximately $5.2 million in

3   assets and funds as a result of the related forfeiture action.  See FTC v. Inc21.com Corp., No. 10-

4   cv-00022-WHA (N.D. Cal.) (Dkt. No. 172 at p. 18); Sentencing Recommendation, p. 2 ("The loss

5   figure of $5.3 million drives the increase in the base offense level in this case, which is appropriate

6   but does not appear to take into account that most of this amount, approximately $5.2 million, has

7   been seized in assets and funds in the related civil forfeiture.  The defendant should receive some

8   credit for nearly returning the entire amount of the estimated loss.").

9          Sentencing Mr. Lin to the government's requested 41 months of imprisonment, when

10  applying the government's loss calculation of $5,323,538.27, equates to a month of imprisonment

11  for each $130,000 in loss.  This would be a far harsher penalty than the comparative penalty

12  imposed on infamous offenders such as Bernard Madoff and Bernie Ebbers (both received a

13  month of imprisonment for each $36 *million* in "loss"), Ronald Ferguson ($20.8 million/month),

14  Marc Dreier ($2.9 million/month), Joseph Nacchio ($388,889/month) and Jeff Skilling

15  ($277,778/month) – among many others.[13]  In fact, the U.S. Sentencing Commission is conducting

16  a multi-year study of Guideline Section 2B1.1 to evaluate whether the loss table is an appropriate

17  measure of the seriousness of the offense.[14]

18         With respect to policy statements, although the government's own assessment of Mr. Lin's

19  culpability starts at 41 months or below, this calculation does not necessarily consider all of Mr.

20  Lin's personal history or characteristics, extraordinary childhood and family circumstances,

21  medical needs, ███████████████████████████ or his status as a non-violent

22  first offender.  See U.S. Sentencing Commission, Amendments to the Sentencing Guidelines (May

23  3, 2010) (The amendments, which took effect November 1, 2010, increase the availability of non-

24  custodial sentences for certain non-violent offenders, based on "recognition of increased interest in

25  alternatives to incarceration by all three branches of government and renewed public debate about

26

27  [13] Ellis et al., At a "Loss" for Justice - Federal Sentencing for Economic Offenses, American Bar Ass'n, Criminal Justice, V. 25, No. 4, at 38, Table 2 (Winter 2011), *available at* http://www.alanellis.com/CM/Publications/lossforjustice.pdf (last visited April 23, 2013).

28  [14] See 77 Fed. Reg. 101, pp. 31069-70 (May 24, 2012), *available at* http://www.gpo.gov/fdsys/pkg/FR-2012-05-24/html/2012-12599.htm (last visited April 23, 2013).

1   the size of the federal prison population and the need for greater availability of alternatives to

2   incarceration for certain non-violent first offenders"); see also 28 U.S.C. § 994(j) (The Guidelines

3   "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in

4   which the defendant is a first [time] offender who has not been convicted of a crime of violence or

5   an otherwise serious offense . . . .").

6   **V.     CONCLUSION**

7          For all of these reasons, Mr. Lin respectfully requests that the Court impose the requested

8   sentence of six months imprisonment.  To achieve deterrence, the Court does not need to incur the

9   expense of lengthy incarceration for Mr. Lin.  He already has suffered vast collateral punishment

10  for his conduct and will be summarily removed from the United States.  A six-month sentence is

11  consistent with the Section 3553(a) sentencing factors and appropriate under the unique

12  circumstances Mr. Lin presents.

13                                  Respectfully submitted,

14  Dated:  April 24, 2013                 SHEARMAN & STERLING LLP

15

16                                  By:  _____/s/ Patrick D. Robbins_____

17                                           Patrick Robbins

18                                  Attorneys for Defendant ROY LIN

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

親愛的 Alsup 法官大人，

　　我很高興能有機會替我老公, Roy Lin, 寫這封" Character Letter"。在我眼中，Roy 是一位孝順、節儉、負責任、有愛心、有同理心、熱於助人且非常照顧家人的人。

　　我是先認識 Roy 的母親才經由他的母親認識他的，所以剛開始我對於他的了解都來自於他的母親。那時候他的母親罹患癌症並剛開完刀，身體經常不是很舒服，她對我說 Roy 從小就很乖很聽話、很孝順、做事也很認真努力，加上家中經濟狀況並不是很好，所以今天事業能有所成就都歸功於他很努力一步一腳印的苦心經營而來，而這也是我對他的初步印象。

　　我第一次見到 Roy 就是和他們全家一起去 Mountain View 的教會，見他在教會與朋友們和長輩的相處及舉手投足間處處顯現他對他母親的呵護照顧，我更確定他是個不錯的人，所以才進一步交往。

　　我發現 Roy 對父母真的很孝順，尤其他的媽媽生病時他總是隨侍在側、噓寒問暖並幫他母親按摩試圖消減她身體上的疼痛。他對父親很尊敬，也常陪父親聊天。自從他的母親去世後，他更成為父親的精神寄託及生活重心，他除了加倍傾聽父親的憂傷情緒更經常陪父出門散心以紓解老人家的孤獨。Roy 對弟弟也是呵護有加，因為他自小就得兼負起保護及照顧弟弟的責任，那是源於在他 12 歲時，他與弟弟被送往巴西大伯家三年，原本父母希望他們在國外能有更好的學習環境，沒想到卻被大伯當成童工，讓他們在自己的餐廳工作，每天工作 12 個小時，也沒送他們去上學，所以在巴西的三年裡學業上的學習不僅是空白更遭受大伯一家的欺凌。Roy 的母親得知後才輾轉把他們送到美國，可是沒想到在寄養家庭裡過的也不好，因為寄養家庭的父母沒有工作，主要的收入來源就是 Roy 的父母寄去的寄宿費用，所以他們在那裏常常吃不飽，導致 Roy 還貧血住院，終於後來 Roy 的父母買了一間小房子讓他們獨立居住，才有比較好的生活。我的婆婆每次提到這些過往總會難過自責讓 Roy 小時後經歷這些苦難，但是 Roy 總是安慰他的母親說就是這些磨練造就就我比別人更能吃苦，更懂的努力向上。

　　其實我很感動及佩服 Roy 在經歷這些困苦與磨練時，他從來沒有怨天尤人也沒有被這些挫折打倒，他反而更努力奮鬥想給父母過好一點的日子。這也是我願意嫁給他的原因。只可惜我們結婚後沒多久他母親就過世了，他因為悲傷過度加上壓力太大，竟然得了血癌。我和我公公都很震驚，難以接受這個事實，沒想到他卻很貼心的反過來安慰我們，他說他和很多人比已經很幸運了，因為至少他還有藥可以控制病情，而且更重要的是他還活著，只要活著就還有希望。

　　結婚後，孩子一個個的出生，他是一個顧家愛小孩的父親，每天都會抽空打電話問我和孩子好不好，回家第一件事就是抱抱他的孩子們及陪他們玩，所以孩子們和他的感情都很好，只要 Roy 晚一點回家，他們不是一直問爸爸什麼時候要回來，不然就是索性到窗邊等著看爸爸什麼時候開車進車庫，他們都等著要給爸爸一個大大的擁抱。我的二女兒出生時就有顎裂(Cleft Palate)，所以她在一歲時開刀，三歲起用始接受發音矯正。由於二女兒發音不正確，旁人常聽不懂她在說什麼抑或是會取笑她，我總是很擔心她會被別的同學排擠，但是 Roy 總是鼓勵她多說話並糾正她的發音，也安慰我說只要她好好接受矯正，搞不好以後發音比一般人更好。他總是能引導我往樂

觀的方向去看待事情，並且在我心情不好時開導我，所以我總能安心的依賴他。他常說如果遇到不如意的事情，而我們又無能為力時就將一切交託給上帝，相信祂能聆聽我們的禱告帶領我們走那該走的道路。

　　Roy 很喜歡幫助別人，除了朋友有經濟上的困難求助外，他也常捐款給教會或一些需要幫助的人。而面對別人生意上的請教他也不藏私，總是和人分享他學到的經驗。

　　當聯邦人員到我們家來搜查及後來他被帶到法庭的事接踵而至，我真的感到既害怕又崩潰，我真的不懂到底發生了什麼事，因為我所認識的 Roy，我的丈夫絕對不是個會賺取不當之財的人。我深深的相信他絕對不會是故意犯錯的。事件發生後他也每天都在反省自己到底做錯了什麼，也很自責他帶給家人的困擾。最近他的繼母因為此事件想和他父親離婚，而我們的房東也趁機提高 5 倍的租金想趕我們搬家，家中的經濟狀況本來就入不敷出，也沒什麼存款，原本就已經得靠向親人借貸來過活，現在再加上這突如其來增加的開支，我們根本無法負擔，也無法無止盡的向人借貸。我想出去工作卻礙於三個孩子還小(最大的六歲，最小的才一歲)，需要我在家中照顧，而身邊也沒有人可以幫我。Roy 年邁的父親如果離婚後也需要有人照顧。再加上 Roy 最近的檢查出現癌細胞增加的趨勢，我實在很擔心他的身體。每當午夜夢回想到這種種的一切我就輾轉無法成眠，我真的無法想像如果沒有 Roy 在身邊的日子我和三個小孩該如何活下去，因為他除了是我們家唯一的經濟來源外，更是整個家庭的精神支柱。

　　親愛的法官大人，我想求您在考量用刑時能體諒他不是故意犯錯，而且他也深深自省並在這次教訓中學到了寶貴的一課，更懇您看在他年邁的父親、幼小無辜的孩子們和我-他的妻子及孩子的母親的份上，能網開一面從輕量刑，讓他能夠繼續照顧及陪伴我們並繼續服務社會。謝謝法官大人。

Mei-Ying Wu 敬上

(Wife of Roy Lin)

Dear Judge Alsup,

I am very pleased to have the opportunity to write this Character Letter for my husband Roy Lin. In my eyes, Roy is a filial son, a thrifty, responsible, loving, empathetic and caring person, who takes care of and loves his family.

I knew Roy through his mother, so all my first understanding of him was from his mother. At that time, his mother had a cancer and just received a surgery, so she did not feel well quite often. She told me that Roy had been very good and filial since he was a little boy, and always worked very carefully and hard. Their family financial condition was not very good, so all that he had achieved in his career was attributable to his diligence and hard working. That was also my preliminary impression on him.

The first time I met Roy was in the Mountain View Church, where he went together with his family. From his way of getting along with his friends and the elders and his behavior reflecting his caring for his mother, I was sure that he was a nice person and decided to make further contact with him.

I found Roy was really a filial son, and this could particularly be seen from his close companion with his mother when she was sick, during which period, he showed great concern for his mother and tried to relieve her physical pain by massaging. He also showed great respect to his father and often accompanied him to chat. After his mother passed away, he became his father's spiritual sustenance and center of life. In addition to doubling listening to his father's pain, he also often accompanied him on a walk to relieve his loneliness. Roy also took great care of his younger brother. He took the responsibility of protecting and taking care of his younger brother when he was a child, which could be traced back to the year when he was twelve. At that time, he and his younger brother were sent to the home of his uncle in Brazil and stayed there for three years. His parents had hoped that they could have been in a better environment to study, while they did not expect that their uncle treated them as child laborers by making them work at his restaurant for 12 hours a day, and did not send them to school. During their three-year stay in Brazil, they not only did not receive any education but also were bullied at his uncle's home. After learning that, Roy's mother sent them to the United State, but it was unexpected that Roy and his brother did not have a good life at their foster home. Since the foster parents were unemployed and their main source of income is the fees paid by Roy's parents for Roy and his brother's lodging with them, Roy and his brother often did not have enough to eat and Roy was even sent to hospital due to anemia. Roy's parents finally bought a small house for them to live separately from the foster home, and until then did they have a relatively better life. Each time my mother-in-law spoke of the past, she would always feel sad and was filled with remorse for having Roy experience such sufferings when he was a child, but Roy always consoled her that it was those sufferings that made him be able to bear more hardships than others and better understand that he should work very hard.

Actually, what moved me most and made me admire him is that he had neither ever complained nor was defeated while experiencing those sufferings and hardships. On the contrary, he worked even harder in order to make his parents live a better life, and this is one of the reasons that I would like to marry him. It was such a pity that his mother passed away not long after we get married, and he was in such deep grief and under too much pressure

After marriage, we had several children. Roy is a man who loves his family and children, and he called me and our children every day when he was free, to see if everything is fine. Every time he went back home, the first thing he often did is to hug the kids and play with them, and our kids love their father very much. If Roy went back a bit late, they might keep on asking when their dad would be back, or just simply came to the window so that they could see their dad when he drove the car into the garage. They all waited to give their dad a big hug. Our second daughter was born with cleft palate, so she received a surgery at the age of one and started to receive pronunciation correction at the age of three. Due to her incorrect pronunciation, she often cannot be understood by others or was made fun of by others. I am always worried that she may be pushed out by her classmates, but Roy often encouraged her to speak more and corrected her pronunciation, and consoled me that as long as she received correction training, maybe someday in the future, her pronunciation would be better than the ordinary people. He always helped me to look at things in an optimistic way, and straightened me out while I am in bad mood, so I have always trusted and relied on him. He often says if we meet something unhappy and we can do nothing to solve it, then let's hand it over to God because we believe that God can listen to our prayers and lead us to the way that we should walk along.

Roy is always ready to help others. In addition to providing financial help to his friends who is in financial difficulties, he often donates to churches and someone who needs help. When people consulted him about any business issues, he always shares with them all his experience without any reservation.

When the FBI agents came to search our house and later Roy was brought to the court, I was scared and collapsed. I really do not know what is happening, because the Roy that I know is absolutely not a person who would earn any illegal profits. I deeply believe that he did not intentionally commit any wrongdoings. Upon the occurrence of the matters, he reflected on himself every day to find out what was wrong, and was filled with remorse for the troubles that he brought to his family. Recently, his stepmother is thinking of divorcing his father because of this matter, and our landlord has also increased the rent five times higher in order to force us to move. We cannot make our ends meet and do not have any bank deposit. We now live on the borrowings from our relatives, so we are not able to afford such sudden increased expenses at all. We cannot endlessly borrow money from others. Although I want to work, my three children are too young (the eldest is six and the youngest is only one) who need me to stay at home to take care of, and there is not anyone else who can help me take care of the children. If Roy's father divorced, he would also need to be looked after. Every midnight when I think of all these, I cannot fall asleep. I really cannot imagine how can my three children and I live if we do not have Roy with us. He is the only bread-earner of our family, and what is more, the spiritual pillar of the whole family.

Your Honor, I beg you for taking into the consideration in making your sentencing decision that he was not intentionally to commit the wrongdoings, and he also deeply reflected on himself and learned a valuable lesson from this lesson. Besides, I beg you for a lenient sentence for the sake of his elderly father, the innocent little children and me, his wife and mother of his children, so that he could continue to take care of and accompany us and serve the society. Thank you, Your Honor.

Sincerely yours,

Mei-Ying Wu

Wife of Roy Lin

法官大人您好,

　　我是 Roy Lin 的父親,Sheng Jui Lin。Roy , John 與我夫婦一家四口來自於台灣中部的一個小康家庭。在 1980 年代也就是 Roy 在剛完成國小時(12 歲),台灣退出聯合國,我們兩夫婦為了給孩子們較好的生活與教育機會就把他與他的弟弟 John 送往巴西的哥哥家 ,可是卻沒想到反而讓他們吃盡苦頭。即使後來他們輾轉來到美國,卻又在寄養家庭中遇到了另一次的磨難。這也是我們夫婦倆始料未及的,有時想想又不知道當初將他們送出國是否是對的決定。

　　Roy 是我的大兒子,在他們兄弟倆相依為命的日子裡,他總是得一肩扛起保護及照顧弟弟的責任,這種情形直到我們夫婦 1995 年從台灣搬來舊金山與他們同住後仍未終止,而不懂英文的我們兩夫婦竟也成了他照顧的對象及負擔,但他從未喊累或叫苦,反而竭盡心力的幫助我們適應美國的生活,個性開朗的他更總是扮演起開心果的角色在我們心煩時講笑話逗我們開心。

　　我們夫婦從台灣來所帶的錢不多,為了避免坐吃山空,不懂英文的我們只好硬著頭皮從事起餐飲業,而採買貨源及銷售都由當時尚在就讀大學的 Roy 幫忙,所以我們也是一路探索從甜甜圈店轉而開三明治店賣早餐,本來生意很不錯可惜後來房 東提高租金我們無力負擔只好又轉而經營一間小日本餐廳。這間小日本餐廳座位不多,但我內人為了多賺一點錢將店的營業時間增長,又為了能與客人好好溝通又積極去學校學習英文,可以說是從早忙到晚,睡眠時間很短。Roy 一直是個刻苦耐勞又貼心孝順的孩子,自大學起就半工半讀完成學業,而看到自己的母親這麼辛苦,於畢業後更是積極得投入職場想讓我們夫婦可以早一點退休。 只可惜他的母親因為積勞成疾竟於 2006 年 2 月初在其子宮被診斷出罹患惡性黑色素瘤,而且已經是晚期了。經過手術切除並化療卻仍敵不過病魔而於 2006 年底過世。我們全家都哀慟不已,而我每當想起結髮多年的妻子整天就是哭,那整整半年的日子裡我幾乎每天都得靠著 Roy 來陪我說話或帶我外出散步來轉移我憂傷的情緒,如果不是他的陪伴我真的不知道我該如何度過那段日子。

　　我知道 Roy 也非常傷心他母親的離世,可是他為了安慰我卻把自己的情緒壓抑下來導致後來於 2007 年底卻發現自己得了血癌,每天都得服藥來控制病情,而藥物的副作用就是讓他頻繁的拉肚子,一天得跑廁所好幾趟,但是為了一家老小的生計,他還是得努力的工作絲毫不能鬆懈。我很想幫助他,但我已高齡 75 歲,加上曾經動過腦部手術,又有高血壓及心臟病,我本身的身體也很差,就算想幫忙他也心有餘而力不足。加上最近我不明原因的昏倒二次被送往醫院急診室,剛結褵來作伴的老婆因此官司要與我離婚趕我出去,而一向奉養我的兒子又官司纏身,我真的不敢想像自己未來該如何生活下去。Roy 他們現在的房東又想盡辦法要將他們趕出去以提高房子價值,而歷經官司幾年下來早已用光存款的他們也實在無法負擔房東所要求的高額租金,我很擔心我那三個幼小的孫子及媳婦屆時會不會流落街頭沒地方可住。對大人而言,世界可以有很多可能性,可是對這些幼小需要被保護的孩子們而言,父母就是他們的全世界,唯一能保護孩子們的就是父親跟母親和在一起的力量,也唯有父親和母親的共同保護,孩子們才能得以正常的成長。

　　　法官大人，**Roy** 是善良有愛心的孩子，公司成立至今已 **10** 年，在這期間他也秉持回饋社會的心態，製造就業機會並時時捐款給需要幫助的人或機構。身為父親的我真的感到很抱歉我沒有足夠的知識及能力能好好提醒教育我的孩子做事要謹慎小心，對於自己不懂的事應該一再求證再去做而不是輕易的相信別人所說就輕易行事。看子官司連連加上他最近的癌細胞似乎有增加的趨勢而我這個老父親本身也年老疾病纏身，妻子又強迫於六月份要與我離婚並要我搬出她的房子，我實在是既擔心又害怕。此事件後，我們全家嘗盡人情冷暖，除了彼此根本無人可以依靠，以現在家庭的狀況而言不論是物質或經濟上我真的很需要 **Roy** 在我旁邊照料及資助，不然我真的不知道要如何生活下去。**Roy** 對於他自己的無心之錯已懊惱不已並很認真的深切反省，我這個無所適從的父親現在除了擔憂還是擔憂，只能祈求您能給 **Roy** 一個改過自新的機會，從輕量刑，讓他不要錯過陪伴兒女們成長的機會並繼續承擔起當人兒子、丈夫及父親的責任也能重新回歸人群繼續服務社會，做個好國民。您的恩澤將使我一家永生難忘。萬分感謝！

Sheng Jui Lin 敬上

Dear Judge:

I am Sheng Jui Lin, Roy Lin's father.  Roy, John, my wife and I were from a well-off family in mid-Taiwan.  In 1980 when Roy was 12 years old and just finished elementary school, Taiwan withdrew from the United Nations.  In order to provide with our children a better education opportunity, my wife and I sent Roy and his younger brother John to my elder brother's home in Brazil, but we did not expect that they suffered a lot there.  Even though they were later transferred to the United States, they experienced another hardship in the foster family.  All those were unexpected by my wife and me.  Sometimes I really doubt if it is a right decision to send them abroad.

Roy is my eldest son.  During the days the two brothers depended on each other, he always had to take the responsibility of both protecting and taking care of his younger brother.  Such circumstance was not changed even when my wife and I moved to San Francisco from Taiwan to live with them, and we even needed his care and became his burden for that we did not know English, but he had never complained and on the contrary, he tried his best to help us adapt to the life in the United States.  He was such a cheerful child that he had always been our good laugh and tried to cheer us up when we were upset.

My wife and I did not bring much money from Taiwan.  To avoid using up our then existing money, we had to bite the bullet and engaged in the restaurant-related trade although we could not speak English.  Roy, who was in the university at that time, helped us with all the work related to the procurement of raw materials and selling.  We explored our way from opening a donuts restaurant to a sandwich restaurant to offer breakfast.  We did well until the landlord increased the rent.  Since we were not able to pay the increased rent, we closed the sandwich restaurant and opened a small Japanese food restaurant.  We did not have many tables in that small Japanese restaurant, but my wife extended the business hours in order to make more money.  Beside, in order to better communicate with our customers, we went to a language school to learn English.  We were kept busy from day to night and had very little time to sleep.  Roy has been a very diligent, considerate and filial child, who had been working part time at the university.   Seeing his mother worked so hard, he worked very hard after graduation in order to make us retire earlier.  It was such a pity that in February 2006 his mother was diagnosed with advanced uterine malignant melanoma which was resulted from her many years of hard work.  After receiving surgery and chemotherapy, his mother was unable to fight off the disease and passed away at the end of 2006.  Our family was in deep sorrow and I could not help crying each time when I thought of my wife of many years.  During the complete first half year after my wife passed away, I was relying on Roy to distract me from my sadness by chatting with me or bringing me out for a walk almost every day.  I really did not know how to survive through those days without his accompanying.

While for the livelihood of the whole family, he has to work hard without any stop.  I really want to help him, yet as a 75-year-old person who received brain surgery and has hypertension and diabetes, I was in such bad healthy condition that even though I want to help him, I do not have such ability.  In addition, I fell unconscious for twice recently for unknown reasons and was sent to a hospital emergency room, and my newly married wife wants to divorce me and force me to leave her house due to the lawsuit Roy is involved in.  The son I have been depending on is now caught in lawsuit.  I really cannot imagine how I can live in the future.  The current landlord of Roy

is trying every effort to force them move by increasing the rent, and they cannot afford the increased rent since they have used up all the money they have saved to deal with the lawsuit. I am worrying that my three little grandchildren and daughter-in-law may have no place to live in. To adults, there may be many possibilities in the world; while to those children who need protection, their parents are their whole world. The strength of father and mother staying together is the sole strength that can protect the children, and only the joint protection by the parents can ensure their normal growth.

Your honor, Roy is a kind and caring child. His company has been established for ten years, during which period, with the attitude to contribute to the society, he created employment opportunities and donated money to those persons or institutions that needed help. As his father, I really feel sorry that I do not have sufficient knowledge and capability to remind him to be cautious in the transaction of businesses. My son is caught in lawsuit ███████████████████████████████████████████████████████. I am old and sick. Besides, my wife is forcing to divorce me by this June and asked me to move out of her house. Under such circumstances, I feel really both worried and scared. From this experience, we deeply felt the cruelty of human nature and found that we do not have anyone else to depend upon except ourselves. Under the current condition of our family, I really need Roy, no matter financially or spiritually. Otherwise, I really do not know how to survive. Roy felt deeply regretful for what he had unintentionally done and has seriously reflected on himself. I, a father who does not know what to do, can do nothing but worry. I beg you for giving Roy both an opportunity to correct his errors and make a fresh start and a lenient sentence so that he will not miss the opportunity of accompanying his children to grow up, assume his responsibility as a son, husband and father, and can return and continue to serve the society and be a good citizen. Our family will never forget your kindness. Many thanks.


Sincerely yours,

Sheng Jui Lin

# The Permanente Medical Group, Inc.
2238 GEARY BOULEVARD
SAN FRANCISCO, CALIFORNIA 94115-3394

ANTIOCH
CAMPBELL
DAVIS
FAIRFIELD
FREMONT
FRESNO
GILROY
HAYWARD
MARTINEZ
MILPITAS
MOUNTAIN VIEW
NAPA
NOVATO
OAKLAND
PARK SHADELANDS
PETALUMA
PLEASANTON

RANCHO CORDOVA
REDWOOD CITY
RICHMOND
ROSEVILLE
SACRAMENTO
SAN FRANCISCO
SAN JOSE
SAN RAFAEL
SANTA CLARA
SANTA ROSA
S. SACRAMENTO
S. SAN FRANCISCO
STOCKTON
VACAVILLE
VALLEJO
WALNUT CREEK

March 15, 2013

Dear Judge Alsup:



Sincerely,

Amy Lin, MD



**KAISER PERMANENTE®**

Chris K. Chiang



Saratoga, CA

March 5, 2013

Honorable William Alsup
United State District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup,

It's my honor to serve as a character reference for Roy Lin in the matter of the United States vs. Roy Lin.

As Caring Elder of Canaan Taiwanese Christian Church, 4405 Fortran Court, San Jose, CA 95134, I came to know Roy and his family about seven years ago when Roy's mother was in critical health. Roy always showed loving and caring character toward his family members during this crisis. His mother passed away a few months after accepting Jesus Christ as her personal savior. But Roy's faith in our Lord did not fade away because of his mother's death, instead, it grew stronger and stronger. Soon, Roy was also baptized as a Christian in Canaan Church. It was one of my most fulfilling moments to see Roy's baptism and I watched him grow spiritually.

Roy and his family have been attending our church regularly in the past few years. They also helped our church in various ways, such as inviting church members for dinner, donating computers to church for seniors to learn computing, etc... However, unfortunate circumstances struck him again. Roy has suffered serve health problems in the past few years. He also started having problems with his business. I do not know the details of his business, nor the legal issues he has been facing. But, I do know Roy is a wonderful father, a loving husband, an obedient son, a generous person to friends, and a loyal Christian.

I am sure Roy has learned great lessons from his past business. He has definitely been humbled and will continue to make sound decisions in his life after this instance. As John 8:11 "Go now and leave your life of sin." I hope the Court will give Roy another chance to demonstrate himself as a loyal Christian and obedient citizen.

By His grace and truth,

Chris K. Chiang



GT GreenbergTraurig

Tel 949.732.6622
Fax 949.732.6501
grossw@gtlaw.com

March 15, 2012

**VIA FIRST-CLASS MAIL**

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

     Re:    U.S. v. Roy Lin

Dear Judge Alsup:

    I am happy to serve as a character reference for Roy Lin in the matter of U.S. v. Roy Lin. I first came to know Mr. Lin in the context of providing legal services to him and his company several years ago. We have kept in touch since then and I am quite familiar with his health issues and family responsibilities. As you may know, he ███ ████████████████ is responsible for his small children. Such challenges would be difficult under normal circumstances. They are extremely onerous in his case given that he has been under investigation by multiple agencies for several years, resulting in the seizure of the majority of his assets and now the possibility of loss of liberty. A lesser individual, under the weight of such circumstances, might flee the jurisdiction to escape such responsibilities. In stark contrast, Mr. Lin has directly faced such challenges, accepting responsibility for what occurred at his business, and simultaneously doing everything possible to care for his family. He also has learned from his mistakes and is the type of person who will not repeat them.

    In sum, I respectfully request the Court to take all of these factors into consideration in imposing sentence. Mr. Lin has learned his lesson and wishes only to be a good father and good citizen for the rest of his life.

Best regards,

Wayne R. Gross

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON'
LOS ANGELES
MEXICO CITY'
MIAMI
MILAN'
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PALM BEACH COUNTY
PHILADELPHIA
PHOENIX
ROME'
SACRAMENTO
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV'
TYSONS CORNER
WARSAW
WASHINGTON, D.C.
WHITE PLAINS

286,550,100.1

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM
3161 Michelson Drive ▪ Suite 1000 ▪ Irvine, CA 92612 ▪ Tel 949.732.6500 ▪ Fax 949.732.6501

**RECEIVED**

MAR 1 2 2013

**RICHARD W. WIEKING**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

March 8, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

I have known Roy Lin for over seven years, and what I am going to share with you is my personal experience of him.

During that time, I found him to be someone who was very focused on his family—his wife, his children, his father, and his late mother. He spoke often of them, and always made efforts to make their lives better. I know that it was difficult for him when his mother passed away, and after that, he immediately spent time and energy on creating a comfortable life for his father. So many of us as Americans try to outsource responsibility for our family to someone else, but Roy has always been very involved.

And of course the same applies to his children. I know that they are and continue to be the light of his life. He has always been present for them, and I know hopes to be again as quickly as is possible.

For me personally, I have gone through many ups and downs in my own life over the past few years and always found Roy supportive through words, advice and actions. Being a small business owner is never easy, and having Roy as someone as I could count among my friends has been very meaningful to me.

I know that the court has made a determination with respect to Roy, but I can also say that my life is much richer with Roy in it. I hope the court will give Roy the opportunity to put this behind him as quickly as possible and begin rebuilding his life and his family again. He is truly an asset to the community.

Sincerely,

Daniel Guillory
CEO
Innovations International

To the Honorable Judge of the Court:

      This letter is a recommendation towards Roy Lin. First off and foremost your honor, I am sincerely sorry for not being in front of your presence at the court today to give this recommendation myself. Due to certain jobs hours and responsibilities as a manager of an establishment I could not establish a date and time to arrive. I am here to talk about Roy Lin, even though being prosecuted for certain laws, he has a deep compassion for the people he is encountered with and should not be judged so quickly. Roy has a personality and a state of mind to stop the unjust in this world. Even though making this mistake has caused him to be in a position where perception may take place as a reality, but truly the man deserves nothing more than respect. He has given the opportunity for the Ko family to be able to live through a recession time period in which the Ko family would not have been able to survive without his guidance. The gentleman currently in your court may have made a small mistake, but to place this man in the side of immature lawbreakers is only bringing down a pillar in the community that keeps the building blocks of an economy together. We need people like Roy Lin to shepherd the flock along troubling times and without his help many would have been in disastrous financial pain including myself. This letter may or may not change anything, but hopefully by reading this, your honor, you will truly make the right decision and give a man a second chance. This world is not built of 99% of good and 1% of bad, but the opposite, Roy Lin is an example of that 1% slowly changing this world for the better.

Sincerely,

親愛的法官大人，

　　我的名字叫做梁金財。我和 Roy 及其家人是已認識 10 幾年的好朋友。我目前在 Lake Tahoe 經營一家 Motel，在三藩市也擁有一家小的乾洗店。

　　我是在 1990 年認識 Roy 的，當時他與他的弟弟 John 在三藩市的 mission 區經營一家乾洗店，而我當時是幫他們修理乾洗店的工業用鍋爐(boiler)，那時我就覺得 Roy 和他的弟弟 John 很求上進，年紀輕輕就能半工半讀獨立經營一家乾洗店。

　　第二次見到 Roy 時已是 1995 年，那時 Roy 的媽媽在三藩市 west portal 區開了一家三明治店，那天剛好店裡的冰箱壞掉請我去修理，我才知道三明治店的老闆是 Roy 的父母。我和 Roy 的父母很聊得來所以後來就成為他們家的 family friend。

　　自從與 Roy 的父母成為好朋友以後，我有更多的機會去認識與接觸 Roy，我發現 Roy 是個很孝順的孩子，因為他的媽媽剛從台灣來，不懂半句英文，每次看到 Roy 都是他在幫母親照顧店面並充當翻譯幫母親與客人溝通，他更陪母親到處去採購貨源。

　　2008 年時，Roy 當時正在經營 Inc21，我的 Motel 突然遇到很嚴重的財務危機，當時多虧 Roy 適時伸出援手幫我度過財務危機，否則我的 Motel 會面臨倒閉窘境。

　　我與 Roy 已認識十幾年，在我的眼中，他絕對是個懂事孝順顧家又上進的孩子，我可以保證我所言非假，因為 Roy 是我和他的太太一起保他出來的，我知道他會勇敢的去面對這個官司並記取他人生中這個最大的教訓。希望法官大人能夠網開一面，法外開恩，讓他能有重新做人的機會！謝謝！

　　　　　　　　　　　　　　　　　　　　　　　　　　梁金財敬上

　　　　　　　　　　　　　　　　　　　　　　　　　Chin Tsai Jiang

　　　　　　　　　　　　　　　　　　　　　　　　　4/8/13

Dear Judge:

My name is Chin Tsai Liang, an old friend of Roy and his family for over ten years. I am currently operating a motel in Lake Tahoe and also have a small dry cleaning shop in San Francisco.

I knew Roy in 1990. At that time he was running a dry cleaning shop with his brother John in the Mission District of San Francisco, and I was asked to repair their boiler in the dry cleaning shop. From then on, I have been impressed by Roy and his brother John with their desire to do better and their ability to independently operate a dry cleaning shop at such young ages while they were college students.

The second time I met Roy was in 1995. At that time, his mother was opening a sandwich restaurant in the West Portal District of San Francisco. They asked me to repair their refrigerator, and then I knew the owner of the sandwich restaurant was the Roy's parents. I was comfortable talking to Roy's parents and later became their family friend.

After I became the friend of Roy's parents, I had more chances to understand and contact with Roy. I found Roy was very filial. At that time, his mother just came from Taiwan and did not know any English. When each time I saw Roy, he was always helping his mother take care of the restaurant and serving as her interpreter to communicate with the clients. Besides, he accompanied his mother on the procurement of goods and supplies for the restaurant.

In 2008, when Roy was operating his Inc21, my motel suddenly encountered serious financial crisis. Roy timely lent a hand to help me survive the financial crisis; otherwise my motel would go bankrupt.

I have known Roy for over ten years. In my eyes, he is absolutely a sensible, filial and aspiring child who loves his family. Roy was bailed out by me and his wife and I can guarantee all that I have said here is true. I know he will bravely confront the lawsuit and remember the greatest lesson he has ever learned in his life. I hope that Your Honor may give him a way out and have mercy on him so that he may have a chance to turn over a new leaf. Many thanks.

Sincerely yours,

Chin Tsai Liang

Dated April 8, 2013

James Pan
CEO Luxul Technology Inc.
650-387-0554
James.pan@luxultek.com

Mar 3, 20L3

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup:

It is my pleasure to serve as a character reference for Roy Lin in the matter of the United States vs. Roy Lin. I have been to the same church and our family have been friends with Roy and Roy's family for seven years. I know not much about his business, or the case he was facing during the past years. But as a friend, I am impressed his perseverance and caring character toward people. He is a good husband, good father and good friend.

During the past years, he has faced a lot of family and health challenges. He put his faith in God and prayers to navigate through those challenges. Whenever there is chance, he was always helping and caring for people in need. That is why in our Church, Roy has a lot of good friends and enjoys very good reputation.

He also liked to share with me his concepts and philosophies in doing business. From the conversation, I could find out Roy is a very ethical and good-will business man. The only weakness I could sense though was he sometimes trusted people too much and failed to protect himself properly. But he has tried very hard to understand the United States culture and laws to abide by the laws and do every business decision ethically and lawfully. As a CEO myself who is originally from Taiwan, I know how difficult it is to overcome the cultural barrier in the new country to do business and make success.

In our church, a lot of friends and families care Roy so much and treat him as a trust worthy brother. I hope that the Court will be as lenient as possible in this matter .I believe after this grand lesson, Roy will make a huge progress and will not result in similar mistakes again.

Best Regards,

James Pan

# SMITH LILLIS PITHA LLP

━━━━━━━━━━━━ ▪■▪ ━━━━━━━━━━━━

115 Sansome Street, Suite 1005, San Francisco, California 94104
Office: (415) 814-0405 | Fax: (415) 217-7011

JAMES SMITH
415-814-0404 (DIRECT)
JSMITH@SLPLAWFIRM.COM

February 20, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

**Re:** ***United States v. Roy Lin***

Dear Judge Alsup:

I am writing to provide a character letter for Roy Lin in connection with the above-entitled matter.

I have known Roy for roughly a decade.  Roy and I joined a local chapter of a business organization called Entrepreneurs Organization ("EO") in 2003 or 2004.  We joined at around the same time and I had the opportunity to get to know Roy well, seeing him a few times every month throughout the period of 2003 through 2007.  I left EO at the end of 2007, but I have remained social friends with Roy.

I am aware that Roy has pled guilty to certain charges in connection with his business.  I cannot speak to the charges, Roy's business, or any of the practices involved.  However, I can speak to the person I have come to know over the last decade.

I knew Roy before he was married.  I knew Roy before he became a father (which was around the time our oldest son was born).  I knew Roy ███████████████████ before his mother became terminally ill.  And I have known Roy through all of these ups and downs in his life.  Over the years, I have come to consider Roy to be both honest and trustworthy in all of his interactions with me.  I know Roy is very committed to his family, especially his wife and his children – frankly his children are much of what he talks about when we see one another.

I know this case and pleading guilty has been both trying and embarrassing to Roy.  He is a very proud person and I know he has learned something through this process.  Roy has

William Alsup
February 20, 2013
Page 2

_____

expressed his desire to move forward with his life for both himself and his family, and I believe he is sincere in wanting to move forward. I would request that the Court consider leniency to the extent the Court has such discretion.

If there are any questions, please feel free to contact me.

If there are any questions, please do not hesitate to contact me.

Best regards,

James Smith

**CANAAN**
www.ecanaan.org

迦南臺灣基督教會
Canaan Taiwanese Christian Church
4405 Fortran Court, San Jose, CA 95134
Tel (408)942-2822 · Fax (408)942-2825

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

February 28, 2013

Dear Honorable Judge Alsup,

My name is Ralph Su, the Senior Pastor at Canaan Taiwanese Christian Church in San Jose. I am writing this letter to share some of my knowledge and experience of Roy Lin.

I have known Roy since the first day I was called and served at Canaan Church in 2008. In the past five year, I have known and cared for Roy and his family. Roy has been actively engaging church ministries even though he and his family live in San Francisco. They constantly drive a long distant to join weekend fellowship group meetings and Sunday worship services since they desire to be a part of this community of faith. They proactively reach out to their community and provide their supports particularly to those who just newly arrived from aboard.

In recent years Roy has been undergoing much both physically and emotionally along his journey of life, losing his mom ████████████████████████. In the midst of these life challenges Roy shows his love toward his family and continues to reach out to his community.

Recently he has shared with me of this court case regarding his business and charges against him and his company. He asked me to pray for God's mercy and strength to move forward of his life. Being his pastor, I will continue to pray for Roy and his family the courage to face this court case and its outcome, definitely the grace from the court regarding his sentencing.

I will be more than happy to share stories of Roy Lin if needed.

Sincerely,

Ralph Su

Ralph.su@ecanaan.org

**Jeffrey Sun**

███████████

Cary, NC ████

Phone: 919-438-1868

▸ **Judge Alsup**

Courtroom 8, 19th Floor

450 Golden Gate Avenue

San Francisco, CA 94102

**Dear Judge Alsup,**

I was the minister of Community & Senior Ministry at Canaan Taiwanese Christian Church (CTCC), first located in Mountain View and then moved to San Jose, from March 2006 – December 2010. I have now retired and moved to North Carolina. While I was serving at CTCC, I had the opportunity of meeting Roy Lin's parents and learned Roy's mother was diagnosed with cancer in 2006. I often visited and prayed with the family. Before Roy's mother's passing at the end of 2006, I officiated the wedding of Roy and his wife Maggie.

Roy and Maggie came to CTCC regularly. From interactions with Roy, I learned Roy is a friendly and generous person who gets along with others, honors his parents and works hard at his job. ████████████████████████████████████████████████████ ████████████████████████████████████ Roy was particular in giving to the church. In 2009, he gave Senior Ministry at CTCC 10 older computers which allow seniors to learn computers even to this day.

Above is my relationship and character statement of Roy Lin. Please feel free to contact me if you have any questions.

Sincerely,

**Jeffrey Sun**
March 03, 2013

March 8th, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19 [h] Floor
450 Golden Gate Avenue
San Francisco, CA  94102

Dear Judge Alsup:

I have had the pleasure of knowing Roy Lin for over six years and am writing this letter to provide my impression and opinion of him to you.

I got to know Roy through a group of fellow entrepreneurs where we share business, personal and family issues, in an attempt to provide help and support to each other.  There is a great deal of trust and commitment required in these monthly meetings and over these years I got to know Roy very well.

Roy would always be the first to offer his help and experiences and always sincere in his efforts to provide support to others in the group.  I also found him a very sympathetic and considerate man especially when addressing personal and family issues that we all face from time to time, always putting family first.  Whether caring for his mother in her final years or nurturing his children ensuring they were getting the right start in life and receiving the education the respectively need.                                                                                   Roy thought only of his family.

It is my belief that Roy is a good man, warm hearted in nature and committed to his family. Roy expressed genuine a deep regret over what has happened to cause him to be in his current position.  It is my intention and hope to somehow influence the court to be compassionate towards him.  Roy has a close family who relies on him to provide strength, guidance and support and I believe that he deserves the chance to continue to be that person to them.

I am available and happy to provide any more detailed portrayal of Roy Lin, please do not hesitate to contact me if you feel I can help in any way whatsoever.


Sincerely,


Bryan Watson
CEO / President eChannel Solutions Inc.

2/19/13

Judge Alsup
Courtroom 8, 19th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

RE: Roy Lin

Dear Judge Alsup:

I am providing this letter to offer a personal perspective on Roy Lin, in hopes that you
might offer some leniency.

I have known Roy for about 10 years. In 2006, I a         Roy's wedding to his wife Mei
Ying, or as her American friends call her, Maggie. ████████████████████
████████████████████████████████████   I recall, on many occasions, Roy
proudly showing me photos of his children, ███████   rn in 2007 and ████ born in 2009.

Throughout the years, I have found Roy to be a kind, sincere, well-intentioned person.
Above all, he values and is committed to his family.

This case has been difficult on Roy, but I think he is mostly concerned about its impact on
his family. I believe that Roy deserves the opportunity to continue to be there for his family,
and to raise his children. Please consider this in your judgment, and please offer some
leniency in his case.

Feel free to contact me if you have any questions.

Sincerely,

Rob Wensing
925-461-3575 x 2
rob@wensinggroup.com

Shekinah Mission Center
Pastor Gabriel Young
10011 N. Foothill Blvd., Ste 104
Cupertino, CA  95014

April 2, 2013

The Honorable William H. Alsup
United States District Judge
450 Golden Gate Avenue, 19th Floor
San Francisco, CA  94102

Your Honor:

I am writing in regards to members of my congregation, John and Roy Lin, who have confessed to committing the crime of mail fraud.  Despite their wrongdoings, I have seen their spiritual growth amidst their grief and I support them during this difficult time.

When Roy and John first came to our church with their family, they had many questions about believing in God through their hardship.  Although our church is an hour away from their home, Roy continued to come back every Sunday, his wife and children always with him.  They are all precious additions to our congregation.  Last year, I baptized both brothers together.  I have seen their hearts of repentance and how they have humbled themselves before the Lord.

Congregation members frequently note Roy's kind and gentle manner, especially with his children, and how John is helpful and polite.  Roy is a loving husband and father, a provider for his family.  I see how deeply these brothers care for each other and love their family.  While Roy and John have been misguided in their actions and should pay for their crime, I hope that you will consider his family and their good qualities when you give your ruling.

Thank you for your time and consideration.  May God bless you.

Sincerely,

Pastor Gabriel Young

親愛的法官大人，

　　我是 Jimmy Chen。我是一位加州合法的會計師並在加州聖荷西擁有自己的會計師樓。

　　我是在 1989 年認識 Roy 的，當時他正在開乾洗店並透過報紙分累廣告尋找幫忙修改衣服的人，而我的前妻經由這個廣告而開始承接起替他的店裡修改衣服的業務，隨著他常常送衣服到我們家來修改，我們逐漸熟捻並進一步成為好朋友，經常一起去郊遊烤肉。

　　後來有一段時間，因為大家都忙於事業就疏於聯絡，一直到二年前，Roy 到我公司來找我請我幫忙報稅，而那時很不幸地我正好和我的前妻正在辦理離婚手續，恰好處於我人生中的最低潮。當 Roy 得知我的處境後，每個星期從舊金山開車到聖荷西陪我聊天散心，這樣子持續了一整個夏天，我才漸漸地走出失婚的情緒。對我而言，Roy 就是這麼懂得適時伸手助人的好友，我也同時看的出來 Roy 是個好爸爸、好丈夫、好兒子。

　　我雖然對官司的內容並不清楚，但是以我對 Roy 的認識，我相信他一定是無心之過，請求法官大人能給 Roy 的處罰降至最低，讓他能繼續陪在三個無辜的孩子身邊陪伴他們成長。

Jimmy Chen 敬上

Dear Judge:

I am Jimmy Chen, a qualified accountant in California, and I have my own accounting firm in San Jose, California.

I met Roy in 1989, when he was advertising in newspaper for a person to alter clothes for his dry cleaning store and my wife started to undertake the business of altering clothes for his store.  He often sent clothes to my home for alternation, so we gradually get familiar and became good friends and often went out for a picnic and barbecue.

Later for a period of time, we did not contact very often because we both were busy with our work.  Until two years ago, Roy went to my firm to ask me to help him with his tax preparation.  At that time, my ex-wife and I were in the process of getting a divorce, and during that period of time, I was at the lowest point of my life.  When Roy knew my condition, he drove from San Francisco to San Jose every week to chat with me and helped me out of my depression.  I gradually got out of the mood of divorce.  For me, Roy is such a good friend who always timely offers a helping hand and I can also see that Roy is a good father, husband and son.

Although I do not clearly know the case, from my understanding of Roy, I believe he must be unintentional in committing the wrongdoing.  I beg Your Honor to minimize the punishment to be imposed on Roy so that he can continue to stay with his three innocent children and see them growing up.

Sincerely yours,

Jimmy Chen

Tsung Chen
510.225.5466
John_chenus@yahoo.com

March 3rd, 2013
Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Honorable Judge Alsup,

First of all, thank you for taking the time to consider my letter as a character reference for Roy Lin in the matter of United States vs. Roy Lin. I have met Roy on many occasions in the last four years and he has always been helpful in my career path to become a successful business man. He has not mentioned much about this legal matter facing him except to pray for him.

As a fellow entrepreneur, I've always received good advice from Roy. He shared his business acumen freely with me, always espousing the ideals of working hard and dealing with people fairly. Over the many conversations, I could gather that Roy believes in the American Dream and in helping others achieve theirs.  If I were to venture a guess for what got him in trouble it would be his sometimes blind idealism. Roy believes that people are good. As such, Roy is not so good at setting up defenses from people. In his business, he probably did not set up the proper business management processes and controls to prevent people from behaving badly, hurting his organizations and his customers as a result. Though I believe ignorance is not a defense of this legal matter, it is a mitigating factor.

Roy is good natured and has many friends. I hope that the court will be as lenient as possible and be considerate of his young wife and three young children. His family emigrated from Taiwan and Roy is their main support in a foreign land. Please don't let his past mistake translate to a real and long time away from his wife and kids. They are in need of him as a provider, husband, and father.

Thank you for your considerations,

Tsung Chen

February 26, 2013

Judge Alsup
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Roy Lin

Dear Honorable Judge Alsup:

I am writing this letter to provide my personal perspective on Roy Lin, hopefully you may offer some leniency to him.

Through introduction by Roy's father, I have known Roy for more than five years. During these years, I have been very closely associated with Roy for many family events and business gatherings. Through my close, thorough observations, I have found Roy to be a sincere, kind, diligent and respectable person – totally committed to his family, filial to his father, loyal to his friends, true faithful to God and trust-worthy to the community. It is worth to mention that, each year Roy has made generous donations to the local church. And it happened to me that when Roy learned from his father about I was encountered a difficult financial situation three years ago, he has promptly showed his generosity by his willingness to help.

This case has been rather difficult for Roy, because his entire family including his wife Maggie, three little children – ████████ (age six), ████ (age four) and ██████ (age one), and his old father, all depend on Roy for day-to-day support, living care and assistance. I kindly and sincerely ask if your honor can offer some leniency in this case to allow Roy to stay home with his family ██████████████████████████████████.

Please feel free to contact me if you have any question.

Sincerely yours,

Stephen Cheng, Ph.D.
Phone: (408) 621-5078
Email: stepen.cheng988@gmail.com

**ING**

ING FINANCIAL PARTNERS
**Brian Chew**
**Registered Principal**

**California  Insurance License # 0C35339**

March 5, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup:

I would gladly provide a character reference for Roy Lin in the matter of the United States
vs. Roy Lin.

I have been friends with Roy for over 25 years. He has always been honest and forthcoming in all of our
dealings as friend and in business. We have interacted over the years as I witnessed his success and personal
drive to provide solutions to others.

In many frank conversations with him, it has come to my attention that Roy has never intended to fool or
deceive anyone in his endeavors. Furthermore, it seems as his only mistake was to have faith in the wrong
people to handle matters he himself was not qualified to handle. This is extremely unfortunate as this has taken
a toll on his health, family, and future business endeavors.

Roy is an extremely trusting individual and he trusted the wrong people to handle some of his troubled
situations many of which have to do with this case. I am encouraged by his strength and optimistic outlook
since he has been through much pain in this process. I fully believes as he rebounds from this case he will be
an incredible asset to our country as he continues to strive for excellence in the business world.

Feel free in contacting me if you have any further inquiries.

Sincerely,

Brian Chew
415-516-2060
CA License 0C35339



To Whom It May Concern:

My name is Michael Cung, owns a solar company, called King Solarman Inc. in Fremont, CA. I met Roy Lin at Cannan Christian Church in 2006. Roy is a devoted Christian and I have been seeing his whole family at Church, trying hard to build up a loving family. I am happy to see his wonderful family at Church.

In 2008, I started King Solarman, not easy at all. Roy has been offering some advise during the struggle. We discuss about multiple business opportunities and the business community. Roy is a law-abiding businessman. In recent years, I get to know Roy has legal issue from his business and Roy has health problem. We all work hard and try to do a good job at work and at home. I wish Roy can continue to keep up the beautiful and the wonderful family, with a nice wife and 3 kids.

I hope you can forgive Roy and give Roy a chance to rebuild his life. Now Roy's career is all shut down and stopped. A man without a career, is nothing. We all know we should obey and observe the law in USA. I believe Roy will be a good citizen after this event. Your help is very vital.

Thanks,

Michael Cung

CEO of King Solarman Inc.
48900 Milmont Dr. Fremont, CA 94538
Mike@King-Solarman.com
408 373 8800
4 - 9 - 2013

HENDRICK HAN
CELL: 650-255-7731
E-MAIL: HANLAO3@YAHOO.COM

April 10, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

  **Re:** *United States v. Roy Lin*

Dear Judge Alsup:

  I am writing to provide a character letter for Roy Lin in connection with the above case.

  I have known Roy for more than twenty years.  We went to Abraham Lincoln High School together and then spent two years in City College of San Francisco together from 1988 to 1990.  We have been good friends since then.  We share many good times together during our college years, such as road trips, camping, and of course, party during the weekend.

  Later on we move on to separate colleges and careers, but we kept in touch.  He was in my wedding and helping me during the receptions, giving rides to some of our guests. I was in his wedding helping him running errands.  I was also there when he lost his mother to cancer. Through the years, I know Roy is a trusting friend, loving husband and caring father.

  Although I cannot speak for this case, but I know that he has pleaded guilty. This ordeal has been an embarrassment to him both personally and professionally.  Roy is a very proud man. I witnessed his ups and downs all these years and I know that he has learned something through this process.  He told me many times that during his younger years, he was so wrapped up in his business and he lost his sense of direction.  Roy has expressed his desire to move forward with his life.  He wants to spend more time with his wife and his three young children.  I believe that he is ready to live a life which his family will always come first.

  **I sincerely request that the Court consider leniency in his case.**

  If there are any questions, please feel free to contact me.

Best regards,

Hendrick Han

March 6, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup,

It is our pleasure to serve as a Character reference for Mr. Roy Lin in the matter of United
States vs Roy Lin.

We have known Mr. Roy Lin through his parent who we met at Senior Taiwanese Association
Activity more than ten years ago. Since then Roy always has brought his parent to our church
(Cannan Taiwanese Christian Church) to attend the Sunday worship and other activities. Later
the Lin's family member were baptized.

We also attended Roy's wedding ceremony and visited his house many times. Couple years ago
his mother got sick and he took very good care for his mother up to her pass away. We know
Roy is a good boy who listen to his parent's words very well and show the filial obedience to his
parent.

In our church Roy appears to be a very polite and kind to congregation, especially toward the
senior. He is very helpful to our church and nice to everybody. We believe he received the
God's words in the Sunday worship and do his best to be a person royal to the family, society
and country.

We hope that the court could reconsider this matter.


Best Regards,


Ying-Yen Hsu

Zuei-Fuei Hsu

Los Altos CA
650-962 8730
yhsu2310@sbcglobal.net

February 28, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

  **Re:***United States v. Roy Lin*

Dear Judge Alsup:

I am writing to provide a character letter for Roy Lin as my former business employee and after
he had started his own business, we later have remained as social friends & acquaintance.

I knew Roy around 15 years ago in the long distance carrier days of MCI and Qwest
Communications. Roy was very committed to his work and always kept up-to-date in finding
new resources to improve our company's marketing campaigns towards the Asian market.

Roy is a very proud and optimistic person, always thriving to learn something new and applying
the concept immediately to his projects we had given him.

After he had left 3 years later to start his new ventures, we still kept in contact on a social level.
Casually conversing, he once told me that as we age, having your own family is key to growing
yourself and to feel life's true meaning, being able to share with a loved one of daily happenings,
and after attending his wedding day, I then realized that he had that many friends who came to
wish him well, both his friends and family from overseas too, meaning he was well-like and
many came to celebrate with him.

When we have met at times to catch up, Roy has expressed his desire to learn from past
mistakes, while giving back to society and wanting to do more charity work. He often tells me
when we gather that we can only use so much, while there are lots of people out there who need
our help just to survive, and suggested to me that if I could help to do voluntary work or give
back in anyway to society, to keep that in mind...

With Roy having such a desire and generous heart to do good deeds and give back to society, I
believe he is sincere in wanting to accomplish these goals whenever he possibly can, and strives
to be a better person, once given this opportunity.

If there are any questions, please feel free to contact me.

Best regards,

Melissa Huang

San Francisco, CA
(415) 828 -3688

親愛的法官大人,

我的名字是 Victor Huang。我目前是一家中型電訊企業的負責人。我是於 1998 年經由生意夥伴的介紹而認識 Roy,經過一段時間的往來後,Roy 即變成我們家的 family friend。

在 2000 年時我將生意從中國移回美國,當時我是從事電訊批發的生意並投資金額高達上百萬元的電訊設備,創業初期由於對美國市場並不熟悉,所以壓力極大。還好 Roy 很用心的幫我找到一個在北加州的大客戶,讓我的生意從此奠定基礎並才得以一步步的成長茁壯。

2010 年的暑假,我帶全家至 Aruba 度假,沒想到我的老婆竟發生意外而不幸過世。當 Roy 輾轉從其他朋友那兒得知此消息後就打電話來關心我,後來更經常打電話來與我談心並花心思介紹新朋友給我認識帶我慢慢走出喪偶的陰霾。

法官大人,在我眼中,Roy 是個貼心與熱於助人的朋友,我相信經過這次官司,他必已記取教訓,以後處事會更謹慎小心。請求法官大人在判刑時能衡量他的家庭及其身體健康狀況而給予懲處,盼您能給予他一個改過自新的機會且能盡速回歸社會。謝謝!

Victor Huang 敬上

Apr. 9. 2013

Dear Judge:

My name is Victor Huang, the head of a medium-sized telecommunication company.  I knew Roy in 1998 through the introduction of my business partner.  After associating with him for some time, Roy became our family friend.

In 2000, I moved my business from China to the U.S..  At that time, I was engaged in the wholesale of telecommunication equipment, in connection with which I invested up to one million dollars in telecommunication equipment.   At the early start of my business, I was unfamiliar with the U.S. market and felt great pressure.  Fortunately, Roy helped me find a major client in North California, which laid the foundation for my business and helped my company grow step by step.

In the summer of 2010, my family went to Aruba for vacation.  It was unexpected that my wife died in an accident.  Roy learned the news from other friends and called to console me.  After that, he often called to chat with me and introduced new friends to me and got me out of the sadness of losing my wife.

Your Honor, in my eyes, Roy is a considerate friend who is always ready to help others.  I believe he must have remembered the lessons he learned from this case and will be more careful in doing things in the future.  I beg Your Honor to take into consideration of his family and his healthy condition in passing sentence on him and give him a chance to turn over a new leaf and return to the society.  Many thanks.

Victor Huang

Dated April 9, 2013

法官大人，您好，

　　我的名字是林啟明。我是一位裝修師傅，同時也是台灣佛教慈濟(Tzu Chi)功德會舊金山分會的義工。

　　我剛認識Roy時，他正在讀高中，Roy經常問我哪裡可以打工，因為他覺得父母在台灣賺錢很辛苦，所以他想半工半讀來減輕他父母的經濟負擔。我很感動他對父母的那份心意，所以只要周末有一些油漆或是裝修的工作，我都會帶著他一起去。我發覺他真是個努力勤奮、認真學習的好孩子。

　　Roy的父母於1995年移民來美國，因為夫婦倆都不懂，所以家裡的大小事情都得由Roy一肩扛起負責處理。這二十幾年來，我知道Roy除了照顧父母外並一心一意致力於他的事業，因為他一直期待能改善家中的經濟狀況給父母過好日子。

　　從我一路看著他成長，我認為他是一個有慈悲心、熱於助人、孝順父母、照顧手足及奉公守法的好孩子。雖然他是一個基督徒，但是每當慈濟(Tzu Chi)向他請求資助時，他都不吝捐出善款去幫助有困難的人。他對父母、弟弟的照顧我們這些做長輩的也都看在眼裡。法官大人，由於Roy從小就無父母在身邊，因此已經習慣所有的一切都得靠自己去摸索，所以在不甚了解的狀況下而誤觸法律。請求法官大人能法外開恩、從輕發落，讓他能繼續照顧他年老的父親及幼小的子女並回饋社會。

林啟明敬上

Chi min Li
CHI-MIN LIN

Dear Judge:

My name is Chi-Min Lin.  I am a renovation worker and also a volunteer of the San Francisco Branch of Taiwan Buddhist Tzu Chi.

When I first met Roy, he was in his high school.  Roy often asked me where he can get a part-time job because he felt his parents were very toilful in making money in Taiwan and wanted to work part-time to relieve his parents' financial burden.  I was moved by his minds on his parents, so as long as there was any painting or renovation work, I always asked him to join me.  I found he was really a diligent and conscientious child.

Roy's parents migrated to the U.S. in 1995.  They did not understand English, so all the matters of the family were handled by Roy.  As I know, in addition to taking good care of his parents over the past twenty years, he also devoted himself to his career, for that he has always wanted to improve the economic condition of his family to make a better living for his parents.

I saw him all the way to grow up, and I believe he is a compassionate, filial and law-abiding person who is always ready to help others and taking care of his brother.  Although he is a Christian, whenever Tzu Chi requests donation, he has never hesitated to make donation to help those who are in difficulties.  What he has done to his parents and his younger brother has impressed us deeply.  Your Honor, since Roy had lived separately from his parents since he was very young, he had got used to handling everything on his own, so he unintentionally violated the law due to his ignorance.  I beg Your Honor to grant extrajudicial mercy and lenient punishment, so that he is able to continue to take care of his aged father and young children and return to the society.

Sincerely yours,

Chi-Min Lin

法官大人，您好，

　　我是 Michael Liu，目前在中国珠海璀璨美甲服務有限公司擔任產品销售經理。我於 2001 年在一個朋友的手機店認識 Roy。那時候的 Roy 在 qwest 電訊公司上班，而我正剛成立了自己的電話卡公司。由於 Roy 已在通訊業服務多年，所以他總能給我很多關於通訊業的指導並介紹很多通訊業的朋友給我認識，甚至於還給我相當可觀的財力支援。後來公司不幸因爲大環境的關係而經營不善倒閉，但是 Roy 不僅從未向我索討那筆投資金，反而很關心我的下一步動向，並很熱切的詢問我是否需要他的協助。

　　總之，對我而言 Roy 是一個熱心助人不求回報的好人，我雖然完全不了解這次的官司內容，也沒有權力去發表對這個官司的任何意見，但是我只希望法官大人在做判決時能看在他是無心犯錯且也已獲取教訓的份上能給予從輕量刑以其讓他能重新回歸社會繼續替社會進一份心力。

Michael Liu 敬上

3～31～03

Dear Judge:

I am Michael Liu, the product sales manager at China Zhuhai Cuican Nail Beauty Service Co., Ltd..  I met Roy in 2001 at the mobile phone store of one of my friends.  At that time, Roy was working at Qwest Communications and I just established my telephone card company.  Roy has quite a few years of experience in telecommunication and he often gave me lots of advice with regard to the telecommunication industry and introduced many friends who engaged in the telecommunication industry to me.  What's more, he even provided me with considerable financial assistance.  My company was later closed down because of poor management due to the overall environment.  Roy had never asked me to repay his investment, and on the contrary, he was concerned about what I was going to do next and earnestly asked me if I needed his help.

 In a word, in my eyes, Roy is a person who is always ready to help others without asking for any return.  Although I neither know any details of the case nor have any right to express any opinion with respect thereto, I just would like Your Honor to grant him leniency for that he committed the wrongdoings unintentionally and had learned a lesson from it, so that he may return and continue to make contribution to the society.


Sincerely yours,

Michael Liu

Dated March 31, 2013

Rob Meadows
CEO Originate
650-544-5572
rob@originate.com

Feb 19, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA  94102

Dear Judge Alsup:

It is my pleasure to serve as a character reference for Roy Lin in the matter of the United States vs. Roy Lin.

I have been friends with Roy for eight years and have gotten to know him well both personally and as a CEO. He is a kind and caring person, and is always working to learn and to become the best person he can be.

Roy has faced several family, health, and business challenges while navigating a new culture, a new language, and a new set of laws in the United States. I have seen him make extremely moral and ethical decisions along the way though each of these challenges. Although I do not know, and cannot speak to, the details in this particular case, it is my belief that Roy has acted with good intentions and has learned some very valuable lessons along the way.

Roy has also helped me through several challenging personal and business challenges. I faced many of the same challenges as Roy when setting up a business in China several years ago. The way business is done there was completely foreign to me and Roy provided invaluable insight and coaching that has led me to now have a successful business in China. I wish I could have had the same opportunity to coach Roy through a similar time when establishing his business in the United States; that certainly could have led to different circumstances in this matter.

As Roy is a good person, a good husband, a good father, and a good citizen, I hope that the Court will be as lenient as possible in this matter. Roy has many people that care about him and will help make sure that his future business endeavors don't result in similar mistakes.

Best Regards,


Rob Meadows

## ACCURATE ACCOUNTING
## CONSULTANTS

Daly City, CA ████
Cell:  415-699-8917
Fax:  415-586-8100
Rezanoorkayhani@yahoo.com

March 12, 2013

Judge Alsup
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Re: Roy Lin

Judge Alsup,

This letter is to provide a personal reference on Mr. Roy Lin, in hopes that you may offer him leniency on your upcoming ruling.

Roy has been a friend of mine for the past 10 years. I know Roy and his wife Maggie are raising three young children. His support ensures the family is being raised in a tight family environment. Roy is a kind, ethical and sincere man.

Roy is committed to solid business and family values.  I know Roy is an entrepreneur as he has been self-employed for at least 15 years and in this case, he may have made material mistakes to damage his business and reputation.

Roy has gotten himself into trouble by exploring the technology frontier, (i.e., internet marketing), although there are no laws preventing one from running a bad business.

This case has taken a tremendous toll on Roy and his family. I believe Roy is a major contributor for upbringing his three children and deserves an opportunity to support for his family.  Please consider this in your judgment, and please offer some leniency in his case.

Feel free to contact me if you have any questions.

Sincerely yours,

Reza Noorkayhani, CPA

3/6/13

Judge Alsup
Courtroom 8, 19th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

RE: Roy Lin

Dear Judge Alsup:

I am providing this letter to offer a personal perspective on Roy Lin, in hopes that you might
offer some leniency.

I have known Roy for more than 10 years. We went to the same church and fellowship. He is a
kind and sincere person. In 2006, I attended Roy's wedding to his wife Maggie. In September,
2011, Roy has attended my wedding. At that time, he already has 2 daughters. Now he has 3
children as his son was born last year. Roy is a loving father and a faithful husband. He is fully
committed to his family. His children love him and would love to have him in their lives.

This case has been difficult on Roy. He doesn't want to leave his 3 young children and he wants
to there when they need him. It will also be very difficult for his wife Maggie to take care all 3
young children alone. I believe that Roy deserves the opportunity to continue to be there for his
family, and to raise his children. I fully understand that Roy should be punished for his wrong
doing, but please offer some leniency in his case.

Thank you very much for your time and consideration. Please feel free to contact me if you have
any question.

Sincerely,

Dennis Shen
650-963-4886
Dennis_shen@hotmail.com

Commissioner, David Weng
Overseas Compatriot Affairs Commission,
Taiwan, R.O.C.
408 221-9027
david.weng@ecanaan.org

March 11, 2013

Honorable William Alsup
United States District Judge
Courtroom 8, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup,

My name is David Weng, a Commissioner of Overseas Compatriot Affairs Commission, Taiwan. I also serve as a Board Member of San Jose State University Tower Foundation. As a Board Member of Northern California Taiwanese American Center, I have been very actively leading the activities in the Taiwanese community. Also, I have been the Mission Elder of Canaan Taiwanese Christian Church since 2002.

I have known Roy Lin for over 7 years. He has been participating in Taiwanese community and church activities frequently. Roy Lin has confided in me about his recent legal battle. I was very sorry to hear of the pending criminal charges. I can honestly say that I cannot imagine any person less likely to have engaged in such conduct.

Roy Lin has always shown himself to be a man of exemplary character. He is kind, honest, hardworking, willing to help others and devoted to his family.

In summary, I trust Roy Lin implicitly and gladly write this character letter on his behalf. Should you have any questions, please feel free to contact me.

Sincerely,

David Weng

Esther Young



Cupertino, CA

April 7, 2013

The Honorable William H. Alsup
United States District Judge
450 Gold Gate Avenue, 19th Floor
San Francisco, CA 94102

Your Honor:

I have only recently heard about Mr. Roy Lin, his brother, and his family's unfortunate
circumstances. It is incomprehensible that either Roy or John would ever commit a crime. As a
fellow member of the congregation, and a youth group leader, I have seen their honest nature.
Where Roy is timid, John is charming. Roy is a doting father and John is a loving uncle. They
often say you can see your reflection in your children. His children are respectful and pleasant.

Growing up as a young girl, I also was glued to my dad. He taught me how to ride my bike, to
look on both sides before crossing the street, how to buy the right pair of shoes, and what major I
should choose. On the other hand, I also had three older brothers that helped me mature in ways
my father could not. I feel that children need strong male role models in their lives. Where my
mother provided nurture and care, my father provided protection and direction.

In spite of their crimes, I hope you will remember these children, who are still at such an
impressionable age, and limit the amount of time they will be separated from each other.

Sincerely,

Esther Young